# Illinois Official Reports

## Appellate Court

---

### *In re M.R.*, 2020 IL App (1st) 191716

---

| | |
|---|---|
| Appellate Court Caption | *In re* M.R., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Kathleen G., Respondent-Appellant). |
| | |
| District & No. | First District, Sixth Division<br>No. 1-19-1716 |
| | |
| Filed<br>Rehearing denied | February 14, 2020<br>March 19, 2020 |
| | |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 16-JA-140; the Hon. Maxwell Griffin Jr., Judge, presiding. |
| | |
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Amy P. Campanelli, Public Defender, of Chicago (Suzanne A. Isaacson, Assistant Public Defender, of counsel), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Gina DiVito, and Sara McGann, Assistant State's Attorneys, of counsel), for the People.<br><br>Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, of counsel), guardian *ad litem*. |

Panel            JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1      Respondent, Kathleen G., appeals the order of the circuit court of Cook County terminating her parental rights. On appeal, respondent contends the trial court's finding that it was in the minor M.R.'s best interest to terminate respondent's parental rights was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                              I. JURISDICTION

¶ 3      The circuit court entered its final judgment terminating respondent's parental rights on July 22, 2019. Respondent filed her notice of appeal on August 20, 2019. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017), governing appeals from a judgment terminating parental rights under the Adoption Act (750 ILCS 50/5 (West 2016)).

¶ 4                              II. BACKGROUND

¶ 5      Respondent is the mother of M.R., who was born on November 26, 2005. Respondent came to the attention of the Department of Children and Family Services (DCFS) in August 2013, because she appeared to be intoxicated and hit M.R. at Walgreens. She was again indicated for abuse/neglect in October 2014 and referred to family services. Respondent completed substance abuse programs for alcohol in 2014 and 2015. In December 2015, at a meeting with M.R.'s therapist, respondent appeared intoxicated and smelled strongly of alcohol. M.R.'s school had called the police that day due to respondent's behavior. In January 2016, respondent appeared intoxicated at her therapy appointment. She smelled strongly of alcohol, she was stumbling, and her speech was slurred. Respondent also was diagnosed with bipolar disorder and was not compliant with her medication.

¶ 6      The State filed a petition for adjudication of wardship and for temporary custody on February 9, 2016. The petition alleged that respondent was not consistent with her medication even though she has a mental health diagnosis, and she appeared intoxicated at M.R.'s therapist's office and also at the office of her own therapist. Although respondent completed intact family services and an alcohol treatment program, she continued to be intoxicated while with M.R. M.R.'s biological father, Morr. R., was unable to care for M.R. The trial court entered an order for removal of M.R. from her parents' custody.

¶ 7      DCFS evaluators noted that M.R. was afraid of respondent when she drank and that she carried contact information for family members in case respondent was unable to care for her. M.R. wanted to live with her mother, but first she wanted her to stop drinking. M.R. had been exposed to respondent's alcohol abuse and mental health issues for most of her life. The trial court found M.R. neglected due to an injurious environment. On September 20, 2016, after finding respondent unable to parent, the court placed M.R. in DCFS guardianship. Respondent does not appeal these findings.

¶ 8        On January 24, 2019, the State filed a supplemental petition for appointment of a guardian with right to consent to adoption. The petition alleged that respondent was unfit and that M.R. had been placed in her preadoptive foster home since February 9, 2018.

¶ 9        At the unfitness hearing, caseworker Maria Molina stated that she was assigned to the case from August 2016 to mid-2018. When she came into the case, respondent was already engaged in individual therapy to address alcohol and mental health issues, although the alcohol issue was subsequently removed at respondent's request because she felt it did not need to be addressed. Molina believed that the goal of addressing alcohol use should have remained. She never rated respondent successful in therapy under any service plan.

¶ 10       Respondent had supervised visits at the agency or at the court. She would bring cards, gifts, food, and clothing for M.R. Visitation was never held in the community because sometimes respondent would speak about the case, and when they tried to redirect her attention respondent would become aggressive in front of M.R. One visit was cut short by 15 minutes because M.R. became uncomfortable when respondent talked about the foster mother in a hostile manner. M.R. asked that the next two visits be canceled. In 2017, the visits were moved to a court building because respondent would become hostile at the agency.

¶ 11       Respondent was required to do random drops, but she did not attend all the drops. Respondent did not successfully complete services. Molina did not recommend unsupervised visits because of safety concerns and because respondent did not focus on M.R. during the visits. M.R. was removed from the first foster parent's home in February 2018, in part because of the bad relationship between the foster parent and respondent.

¶ 12       Molina's supervisor, Alexa Vander Hye, testified that in October 2017, Molina reported that she did not feel safe and asked Vander Hye to deescalate respondent. Although Vander Hye spoke to respondent, she could not calm down. M.R. appeared fearful and had to be removed from the room. Respondent also had slurred speech and smelled of alcohol at a visit. Respondent continually talked of the case in front of M.R. during visits, which was not appropriate. Sometimes respondent was very appropriate during the visits, but often she was not, and sometimes the police were called because staff did not feel safe. Vander Hye did not recommend unsupervised visits due to respondent's behavior during the visits.

¶ 13       M.R. expressed a desire to return home to respondent. Respondent was evaluated to determine whether she would be able to parent M.R. and, if the goal were changed to termination of parental rights, how that would affect M.R. At the time of the evaluation, M.R. was living with the first foster parent. During M.R.'s interview, she stated that she wanted to live with respondent but that she had a "drinking problem." She did not want to return home without ongoing court supervision. M.R. expressed sadness, frustration, and guilt over her separation from respondent. The evaluator concluded that there was a low likelihood respondent would be able to make the progress necessary to have M.R. returned home. However, completely severing her relationship with M.R. would likely cause M.R. emotional harm. It was recommended that supervised visits with respondent continue.

¶ 14       In March 2019, a client services plan noted that 13-year-old M.R. was living in a nonrelative preadoptive foster home and she was doing well. The current foster parents asked that visits remain at twice a month, and they facilitated all of the visits. M.R. was in therapy, and she was improving greatly. When M.R. was first placed in their home, the foster parents received a call from the school almost every day. As of March 12, 2019, they have not received any calls from the school. M.R. was involved in activities after school, and she no longer met

the criteria for attention deficit hyperactivity disorder. The foster parents stated that they would like to adopt M.R., and M.R. stated she would like to be adopted by her current foster parents.

¶ 15    M.R. was placed in the new foster home because her former foster parent did not protect her or ensure that she attended her therapy sessions. The current foster parents are supportive of M.R.'s relationship with respondent and offered to supervise M.R.'s visits with her. M.R. had her first visit in the community with respondent in March 2019 and was happy that "her parents were going to be all together."

¶ 16    Respondent testified on her own behalf. She acknowledged that she spoke of the case and her alcohol use during counseling sessions. She stated that she initially wanted M.R. to be with the first foster parent because she knew the person and her own family lived out of town. However, she had arguments with the first foster parent because M.R. was doing worse in school, and at one point respondent was prevented from seeing M.R. Respondent also stated that she did the drops and she would remind Molina about having to do the drops. Respondent was the one who called the police because she wanted to know why she could not see her child that day. Respondent stated that she completed drug treatment and parenting classes and completed a family recovery program. She included her certificates in an exhibit.

¶ 17    The trial court found respondent unfit for failure to make reasonable progress from July 2016 through June 2019.

¶ 18    The court then held a best interests hearing. At the hearing, Alexandra Galvez testified that she had been assigned to the case on September 4, 2018. M.R. is in the eighth grade and is doing well in school. She visits with respondent twice a month, and her foster family facilitates these visits. There was some concern because respondent talked constantly about the case in front of M.R. However, the visits will continue.

¶ 19    M.R.'s foster family consists of her foster mother Ashley, foster father Mo, foster siblings including a girl M.R.'s age, and an infant. There was a six-year-old foster child in the home, but the child accidentally drowned in a neighbor's pool. A DCFS investigation is still pending, but M.R. and the other foster children are allowed to stay in the foster home "at the moment." The home is safe and appropriate, and there are no concerns about M.R. remaining there. When asked about adoption, M.R. stated that she wanted to be adopted. She "has a really good relationship with the foster parents and they're able to give her love, attention, and they spend time together as a family." The foster parents allow M.R. to have contact with her older brother. When it was explained to M.R. that the foster parents did not have to allow her to visit respondent, M.R. seemed calm about it. Galvez stated, however, that the foster parents were willing to continue M.R.'s visits with respondent. In her opinion, it was in M.R.'s best interest to terminate respondent's parental rights so that she could have permanency. The foster family could provide that permanency for M.R.

¶ 20    Ashley testified that she and her fiancé, Mo, are M.R.'s foster parents. They also have a 14-year-old foster daughter, who has lived with them for three years, and an 11-month-old foster son. She has been M.R.'s foster mother for 1½ years. Ashley wants to adopt M.R. because she loves her. At first M.R. was skeptical of her foster parents, but they have grown close. M.R. calls Ashley "mom" and calls Mo "dad." M.R. has also bonded with their foster daughter. Ashley stated that M.R. is an amazing child and she hopes they can provide her with permanency. M.R. has told her she would like to be adopted. Ashley and Mo would continue M.R.'s visits with respondent twice a month as long as they are safe and appropriate. Ashley would do whatever needed to guarantee a continued relationship between M.R. and respondent.

- 4 -

M.R.'s foster father was in care as a youth and understands the importance of maintaining relationships with biological family members.

¶ 21    Respondent also testified at the best interest hearing. Although she was not pleased with the testimony of the prior witnesses, respondent respected M.R.'s wishes about being adopted. She loved M.R., and M.R. loved her. Respondent also expressed concern about the accident involving the foster child. She argued that M.R. wanted a relationship with respondent and the only way to guarantee that was not to terminate respondent's parental rights.

¶ 22    The trial court stated that it had previously found respondent unfit by clear and convincing evidence, and it found, by a preponderance of the evidence, that it was in M.R.'s best interest to terminate respondent's parental rights. The court considered the best interest factors, including M.R.'s desire to be adopted. Even respondent acknowledged M.R.'s wishes, although she was not pleased with it. The court also noted the foster parents' "understanding of the biological connection between [respondent] and [M.R.] and the emotional connection and understand that they can provide stability, permanency, parenting and love for [M.R.] in conjunction with [M.R.'s] desire to have a loving relationship with her biological mother and that what we're really doing is extending the family, not destroying it." Addressing respondent's concerns, the court stated that "there are no guarantees in life." The court believed it was in the best interest of M.R. to terminate respondent's parental rights, thereby freeing M.R. for adoption.

¶ 23    The court also acknowledged the death of the six-year-old foster child and wondered whether the investigation would slow the adoption process. The court told Ashley that it had "every confidence that your family will stay together and work to overcome that, go on to provide for the children that you have, this child, and any child in the future."

¶ 24    Respondent appealed the order terminating her parental rights.

¶ 25                                    III. ANALYSIS

¶ 26    The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2016)) provides for the termination of parental rights in a two-step process. "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998))." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). After finding the parent unfit, the court next considers whether it is in the best interests of the child to terminate parental rights. *Id.* Here, respondent challenges only the court's finding that it was in the best interest of M.R. to terminate respondent's parental rights. Therefore, we will not review the trial court's finding that respondent is unfit. See *In re H.S.*, 2016 IL App (1st) 161589, ¶ 36 (failing to challenge the unfitness finding results in forfeiture of that issue on appeal).

¶ 27    At a best-interests hearing during termination proceedings, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). To make this determination, the juvenile court considers the following factors: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the familial, cultural, and religious background and ties of the child; (4) the child's sense of attachments; (5) the child's wishes and long term goals; (6) the child's ties to church, school, and friends; (7) the child's need for permanence, including relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks to the child entering and being in substitute care; and

(10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016). The State must prove by a preponderance of the evidence that it is in the child's best interests to terminate parental rights. *In re D.T.*, 212 Ill. 2d at 366. We will not reverse the trial court's best interest finding unless it is against the manifest weight of the evidence or the court abused its discretion. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 106.

¶ 28      The trial court here found that it was in the best interest of M.R. to terminate respondent's parental rights so that M.R. could be freed for adoption by her present foster parents. M.R., who is now 14 years old, has been exposed to respondent's alcohol use and mental health issues for most of her life. DCFS became involved in 2013, because respondent appeared to be intoxicated and hit M.R. at a Walgreens. Respondent has been in and out of services since then, but she has not been able to make progress on her issues. M.R. was afraid of respondent when she drank, and M.R. carried contact information for family members in case respondent was unable to care for her. In 2016, M.R. was placed with her first foster parent, an acquaintance of respondent. She was removed in 2018 because the foster parent failed to protect her or ensure that she attended her therapy sessions. Her current foster family provides security, love, and attention, and M.R. is doing well. The trial court found that terminating respondent's parental rights was necessary in order to provide permanency and stability in M.R.'s life. This finding is not against the manifest weight of the evidence.

¶ 29      Respondent, however, argues that the trial court also based its finding on the permanency of M.R.'s present situation and the fact that the current foster parents supported a continued relationship between M.R. and respondent. Respondent points out that M.R.'s foster parents are under DCFS investigation and, therefore, the permanency of M.R.'s current placement is not certain. She speculates that perhaps the foster parents will be found negligent in the foster child's drowning and that they may lose their license and M.R. would have to be removed from their care. If M.R. is removed to another foster family, respondent's visitation with M.R. would not be guaranteed.

¶ 30      While the current availability of an adoptive home is one consideration in a termination case, it is not the only consideration. *In re D.M.*, 336 Ill. App. 3d 766, 775 (2002). Courts have recognized that " '[i]t may be just as important to free children from continued involvement with a mother whose chaotic and disruptive lifestyle is a detriment to their welfare.' " *Id.* (quoting *In re B.S.*, 317 Ill. App. 3d 650, 665 (2000)). In *D.M.*, the children had been in the system for three years and were placed in a stable foster home. Although they had bonded with their foster family, the foster mother refused to adopt them because she did not want to interfere with the relationship between the children and their biological mother. *Id.* at 769. The trial court found that it was in the best interest of the children to terminate the mother's parental rights because the case had been in the system for a long time and she could not " 'get [her] act together.' " *Id.* at 770. The mother agreed that the children were thriving with their foster family. However, she argued that, since the foster mother refused to adopt the children, the possibility of removal from their current placement after termination of her parental rights undermined the goal of stability. Therefore, termination of her parental rights was not in the children's best interests. *Id.*

¶ 31      This court affirmed the trial court's finding that "the children's need for a long-term, stable relationship outweighed the necessity of an available adoptive home immediately upon termination of respondent's parental rights." *Id.* at 775. The record was clear the children wished to remain in their foster home and that their mother could not provide a safe, stable

home for them. Although adoption was not an option, termination would give the children an opportunity for some permanency in their lives. Therefore, the trial court's determination was not against the manifest weight of the evidence. *Id.*

¶ 32    M.R.'s current foster family provides security, love, and stability in her life, which until her placement was chaotic and made M.R. feel unsafe. Unlike the foster mother in *D.M.*, M.R.'s foster parents want to adopt her, and she wants to be adopted. While the ongoing DCFS investigation may temporarily halt the adoption process, there is a strong possibility M.R. will be adopted in the future. We emphasize that there has never been a finding that M.R. is not safe with her foster family, and she and her foster siblings continue to live with their foster parents with DCFS approval. Furthermore, respondent has been involved with DCFS since 2013 and has been unable to adequately parent M.R. since that time. The trial court concluded that termination of respondent's parental rights would give M.R. an opportunity to live with her foster family and have some permanency in her life. We agree with the trial court's determination.

¶ 33    Respondent argues that the uncertainty of M.R.'s adoption also affects her continued relationship with M.R., which the court found was an important factor in M.R.'s best interest. While the current foster parents are supportive of her relationship with M.R., if M.R. is removed to another family they may decide to discontinue visitation. Respondent continues to work on her issues and is progressing, and the potential severing of her relationship with M.R. would be detrimental to M.R.'s best interest. Respondent contends that, rather than terminate her parental rights, the "proper result here is guardianship in the foster home with *guaranteed* visitation." (Emphasis in original.)

¶ 34    Although options other than termination do exist, "the permanency goals of return home and adoption are 'statutorily preferred' over private guardianship." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 33 (quoting *In re Jeffrey S.*, 329 Ill. App. 3d 1096, 1103 (2002)). Therefore, guardianship is available only if the trial court determines that a minor should not return home and at the same time finds that the parents' rights should not be terminated. *Id.* Here, the trial court made no such findings. It found that M.R. should not return home, but it also found that respondent's parental rights should be terminated in order to free M.R. for adoption. The guardianship alternative is not available under these circumstances. *Id.* ¶ 34.

¶ 35    We understand respondent's desire for a guaranteed relationship with M.R. and applaud her efforts to address the issues that required DCFS involvement in her life. We reiterate that there is no indication at this point that M.R. will be removed from her current placement or that visitation with respondent will not continue. However, the trial court's consideration here is limited to determining whether it is in M.R.'s best interest to be freed for adoption. *In re M.M.*, 156 Ill. 2d 53, 67 (1993). In this proceeding, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364.

¶ 36                                    IV. CONCLUSION
¶ 37    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 38    Affirmed.