2024 IL App (1st) 231443-U

No. 1-23-1443

Order filed February 21, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* Ser. P., Dia. R., Dam. R., Des. R., and Das. R., Minors, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) | Nos. 14 JA 281-83 |
| Petitioner-Appellee, | ) ) | 16 JA 839 17 JA 1252 |
| v. | ) ) | |
| Destiny S., | ) ) | Honorable Peter Vikelis, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The evidence supported the trial court's finding that termination of the mother's parental rights was in the best interests of the children.

¶ 2    Respondent Destiny S. appeals from the trial court's order terminating her parental rights to her five minor children: Ser. P., Dia. R., Dam. R., Des. R., and Das. R.[1]

¶ 3    Destiny S. argues that the trial court's finding that it was in the best interests of the children that her parental rights be terminated was against the manifest weight of the evidence. Destiny S. does not appeal the court's finding of parental unfitness. The fathers of the minor children are not involved in this appeal.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[2]

¶ 5                              I. BACKGROUND

¶ 6    Destiny S. is the mother of five minor children: (1) Ser. P., a girl born in November 2009 and currently 14 years old; (2) Dia. R., a girl born in June 2012 and currently 11 years old; (3) Dam. R., a boy born in October 2013 and currently 10 years old; (4) Des. R., a girl born in July 2016 and currently 7 years old; and (5) Das. R., a boy born in November 2017 and currently 6 years old.

¶ 7                    A. Case Nos. 14 JA 281-283 (Ser. P., Dia. R., and Dam. R.)

¶ 8    This case began on March 24, 2014, when the State filed petitions for adjudication of wardship, alleging that Ser. P., Dia. R., and Dam. R. were neglected and abused. That same day, following a hearing, the trial court awarded temporary custody of Ser., Dia., and Dam. to the Department of Children and Family Services (DCFS) guardianship administrator.

---

[1] For clarity, this order distinguishes all five children with a three-letter abbreviated first name. The youngest child, referred to herein as Das. R., has the same three-letter abbreviated name as his older sister, Des. R., so he is referred to as Das. R. to distinguish him from his sister.

[2] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 9      In November 2015, the trial court found that Ser., Dia., and Dam. were neglected and abused based on an injurious environment and a substantial risk of physical injury. See 705 ILCS 405/2-3(1)(b), (2)(ii) (West 2014). This order was supported by stipulated testimony entered at the adjudicatory hearing showing the occurrence of domestic violence incidents in the home. These domestic violence incidents occurred while the children were present. Damien R. was then the father of Dia. and Dam.[3] The father of Ser., the oldest child of Destiny S., never appeared in the trial court.

¶ 10      In April 2016, the trial court entered disposition orders, adjudging the minors wards of the court and finding that Destiny S. was unable to care for them for some reason other than financial circumstances alone. The fathers were found unable and unwilling to care for their children. The court placed the children in the custody of the DCFS guardianship administrator with the right to place them.

¶ 11      In February 2019, the trial court entered a permanency order that set a goal of substitute care pending termination of parental rights for Ser., Dia., and Dam., based on the length of the case and the parents' inability to make sufficient progress towards return home.

¶ 12      In November 2019, the State filed supplemental petitions for termination of parental rights for Ser., Dia., and Dam. The State alleged parental unfitness based on statutory ground (b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2018)), for failure to maintain a reasonable degree of

---

[3] Ultimately, Damien R. became the father of Destiny's four younger children, Dia. R., Dam. R., Des. R., and Das. R. On January 22, 2024, this court issued a summary order that affirmed the trial court's judgment finding Damien R. an unfit parent and terminating his parental rights to his four children. *In re D.R.*, No. 1-23-1511 (filed Jan. 22, 2024).

interest, concern or responsibility towards the children's welfare; ground (m)(i) of the Adoption Act (*id.* 1(D)(m)(i)), for failure to make reasonable efforts to correct the conditions that were the basis for the children's removal; and ground (m)(ii) of the Adoption Act (*id.* 1(D)(m)(ii)), for failure to make reasonable progress towards the children's return within any nine-month period following adjudication.

¶ 13    In January 2023, the State filed its ground (m) pleadings for Ser., Dia., and Dam., alleging that Destiny S. failed to make reasonable progress during all nine-month periods between November 2015 and September 2019.

¶ 14                              B. Case No. 16 JA 839 (Des. R.)

¶ 15    After Des. R. was born in July 2016, the State in September 2016 filed a petition for adjudication of wardship, alleging that she was neglected and abused. Following a hearing, the trial court entered a temporary custody order. In August 2017, the court entered an adjudication order, finding her neglected based on an injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2016). The court entered a disposition order, finding both parents unable to care for Des. for some reason other than financial circumstances alone. The court placed her in the custody of the DCFS guardianship administrator with the right to place her.

¶ 16    In November 2018, the State filed a supplemental petition, alleging parental unfitness based on statutory grounds (b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m) (West 2016)).

¶ 17    In February 2019, the trial court entered a permanency order that set a goal of substitute care pending termination of parental rights for Des., based on the length of the case and the parents' inability to make sufficient progress towards return home.

¶ 18    Subsequently, the State filed a supplemental petition, seeking to terminate parental rights as to Des. The State alleged parental unfitness based on statutory grounds (b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m) (West 2018)).

¶ 19    In January 2023, the State filed its ground (m) pleading for Des., alleging that Destiny S. failed to make reasonable progress during all nine-month periods between August 2017 and November 2019.

¶ 20                        C. Case No. 17 JA 1252 (Das. R.)

¶ 21    After Das. R. was born in November 2017, the State, on November 29, 2017, filed a petition for adjudication of wardship, alleging that he was neglected and abused. The same day, following a hearing, the trial court awarded temporary custody of Das. to the DCFS guardianship administrator. In June 2018, the court entered an adjudication order, finding Das. neglected due to an injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2016). In November 2018, the court entered a disposition order, finding both parents unable to care for Das. for some reason other than financial circumstances alone and placing him in the custody of the DCFS guardianship administrator with the right to place him.

¶ 22    In January 2020, the trial court entered a termination of parental rights permanency goal for Das. In February 2020, the State filed a supplemental petition, seeking to terminate parental

rights as to Das. The State alleged parental unfitness based on statutory grounds (b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (D)(m) (West 2018)).

¶ 23    In January 2023, the State filed its ground (m) pleading for Das., alleging that Destiny S. failed to make progress during all nine-month periods between June 2018 and February 2020.

¶ 24                                   D. The Fitness Hearing

¶ 25    The trial court began the fitness portion of the termination hearing on August 16, 2022, over videoconference, without objection. The State offered exhibits, and the court stated it would admit them at a later date. The court continued the fitness hearing to April 7, 2023, which was held in-person at Destiny S.'s request. Her counsel, however, asked the court to continue the case because Destiny S. said that she would be fired from her job if she attended the hearing.

¶ 26    The court continued the case to June 5, 2023, and Destiny S. again was not present for that in-person hearing. The court began hearing evidence and admitted all the exhibits. The fitness hearing and ruling, as well as the best interests portion of the termination hearing and the court's ruling, concluded on July 31, 2023. Destiny S. did not attend the July 31, 2023 hearing.

¶ 27                                1. Evidence Related to 2014-2016

¶ 28    After the three older children (Ser., Dia., and Dam.) were removed from the custody of Destiny S. and Damien R. in March 2014, DCFS conducted an integrated social assessment of the family. The assessment mentioned the December 2013 incident that opened the case, where Damien R., after an argument, made Destiny S. leave his mother's home in the middle of the night without the children, and Destiny S.'s hand was cut due to "interference" from Damien R.'s

mother. DCFS recommended intact family services, but Damien R. did not cooperate. In March 2014, DCFS took protective custody of the three older children.

¶ 29    At the time of the DCFS integrated assessment, Destiny S. seemed committed to reunification and was engaged in domestic violence services, parenting classes, and therapy. The prognosis for reunification was "guarded" because Destiny S. remained in a relationship with Damien R. To achieve return home, they would have to deal with their domestic violence issues.

¶ 30    Nicela Guy, the director of child welfare services at Unity Parenting and Counseling (Unity), the agency that serviced the case, testified for the State that, at the beginning of the case in 2014, Destiny S. and Damien R. needed to engage in domestic violence services, couples counseling, parenting classes, and individual therapy.

¶ 31    Patricia M., the foster parent for Ser., Dia., and Dam. since March 2014, testified that, in April 2016, she was sitting in the waiting area for a court hearing, and Destiny S. and Damien R. threatened her, saying they were going to kill her and beat her up. Damien R. was particularly aggressive, but he did not physically harm her.

¶ 32    The parties stipulated to the testimony of Lori Rodriguez, who was the caseworker from July 2016 to December 2016. During that time period, Ms. Rodriguez believed the parents were making substantial progress due to participating in services and had satisfactory ratings in their service plans.

¶ 33    In late 2016, Damien R. and Destiny S. reported that they got married.

¶ 34                              2. Evidence Related to 2017-2018

¶ 35    Unity director Nicela Guy testified that, as of December 2016, Destiny S. and Damien R. had unsupervised day visits with the children. Damien R.'s visits were suspended in July 2017. Destiny S. had unsupervised visits until June 2018, when her unsupervised visits were suspended because she allowed Damien R. to see the children at her unsupervised visits. Ms. Guy also testified that throughout the entire life of the case, Destiny S. was inconsistent in reporting her history of domestic violence with Damien R., sometimes admitting that it occurred, and sometimes denying it. Despite the parents completing various services, including domestic violence services, Ms. Guy testified that they did not make progress towards the return home goal due to ongoing issues with domestic violence.

¶ 36    Dawn S., the foster mother of Des. and Das. since each child was about five months old, testified that Des. was hospitalized for six days in February 2017, and the parents only visited on the first day.

¶ 37    In a May 2017 parenting evaluation from the Cook County Juvenile Court Clinic, the evaluator reviewed several documents, interviewed both parents, and observed parent-children interactions. The evaluation concluded that there was a low to moderate likelihood of reunification. The evaluation noted that Ser. and Dia. had developmental delays and Ser. had been diagnosed with ADHD, but Destiny S. was mostly unaware of those special needs. Both parents had low intellectual functioning and could not understand their children's needs beyond basic care. Both parents' abstract reasoning ability, judgment, and planning were impaired. The evaluator noted the parents' history of domestic violence and that they had participated in domestic violence services

previously. However, both parents minimized their history of domestic violence by refuting the fact that any physical violence occurred. The evaluator believed that the parents' relationship was marked by "coercion and control." The evaluator reviewed emergency calls and police contact notes and believed that the parents likely were not being truthful about their claim of no physical violence within their relationship. The evaluator noted that the parents had engaged in domestic violence services but their behavior was inconsistent with "learned techniques." The evaluator recommended ongoing couples therapy and individual therapy for Destiny S. and Damien R.

¶ 38    DCFS case notes stated that, in June 2017, Ser. reported an argument between Destiny S. and Damien R. during an unsupervised visit. The notes also stated that, in August 2017, Damien R. threw a dog down the stairs while having an argument with Destiny S.

¶ 39    Jorge Argueta, of the Avance agency, testified that Damien R. successfully completed domestic violence classes in May 2017. Damien R.'s Mount Sinai mental health records and July and December 2017 notes indicated that he was diagnosed with schizoaffective disorder and had poor judgment and intellectual disabilities.

¶ 40    Regarding Destiny S.'s individual therapy, in September 2017, she denied any domestic violence in her relationship with Damien R. The therapist believed that Destiny S. had an adequate understanding of the negative effects of domestic violence, as well as her children's needs. In December 2017, the therapist stated that Destiny S. made only minimal progress towards her treatment goals and seemed to cancel her visits with the children and other service appointments for insufficient reasons.

¶ 41    The March 2018 client service plan, which rated the parents' progress towards the return home goal for the previous six months, stated that progress toward that goal was "somewhat satisfactory" but noted Destiny S.'s and Damien R.'s cognitive limitations and Damien R.'s aggression.  The plan also noted that Destiny S. had cancelled several visits with the children.

¶ 42    In June 2018, Destiny S. violated the visitation order when Damien R. accompanied her to an unsupervised visit.

¶ 43    According to Destiny S.'s and Damien R.'s therapy records at Unity, as of August 2018, they had been discharged from couple's therapy. The report stated that they continued to minimize and deflect responsibility for their inability to make more progress towards the return home goal.

¶ 44    The August 2018 client service plan noted the services that Destiny S. had engaged in and stated that she continued to make bad decisions. For example, she allowed Damien R. to attend her unsupervised visits when he was not allowed, which resulted in the loss of her unsupervised visits. Damien R. continued to be belligerent with the caseworkers.

¶ 45    In December 2018, Destiny S.'s individual therapist reported that Destiny S.'s visits with the children were more consistent and she had made satisfactory progress toward more insight and planning skills, but she did not make "substantial progress." As of March 2019, her therapist wrote that Destiny S. seemed to accept some responsibility for "the mistakes she has made during the course of this case," but she continued to deny domestic violence in her relationship with Damien R.

¶ 46                                    3. Evidence Related to 2019-2020

¶ 47    According to a February 2019 permanency planning report, Destiny S.'s unsupervised visits with the children were suspended recently because she had allowed Damien R., whose own visits were supervised, to participate in an unsupervised visit. She and Damien R. were both appropriate and nurturing during visits with the children. The agency believed the parents had not made substantial progress towards reunification and recommended that the permanency goal be changed to termination of parental rights.

¶ 48    In February 2019, the trial court changed the permanency goal for Ser., Dia., Dam., and Des. to termination of parental rights. The service plan noted that the parents had been discharged unsuccessfully from couple's therapy. However, they were visiting the children consistently.

¶ 49    Laura Schoepfle, the current Unity caseworker since January 2023, testified that, between 2019 and 2020, the Chicago police made more than a dozen "calls to service" to the parents' home.

¶ 50    Chicago police officer Margarita Diaz testified that, in May 2020, she responded to a report of domestic battery at Destiny S. and Damien R.'s residence. When Officer Diaz arrived, she saw Damien R., who told her Destiny S. had thrown an ornament at him and injured his ankle. Destiny S. told Officer Diaz that Damien R. put his hands on her neck and pushed her. No arrests were made.

¶ 51                                    4. Evidence Related to 2023

¶ 52    Unity caseworker Ms. Schoepfle testified that the parents had cancelled a supervised visit with the children in February 2023 because Destiny S. had a tooth problem. Instead, the visit was conducted by video conference, and Destiny S. appeared to have a swollen jaw. Ms. Schoepfle had

trouble arranging a visit with the parents in March 2023, and various later visits had to be cancelled or rescheduled due to problems not caused by the parents.

¶ 53    On July 31, 2023, the trial court found that Destiny S. was unfit under both grounds (b) and (m) of the Adoption Act. See 750 ILCS 50/1(D)(b), (D)(m) (West 2022). The court described all the services both parents had participated in and found that Destiny S.'s "misplaced allegiance" to Damien R. and their continued domestic violence within their relationship showed that they were unfit.

¶ 54                                    E. The Best Interests Hearing

¶ 55    The trial court began the best interests portion of the termination hearing immediately after making its fitness findings.

¶ 56    Unity caseworker Ms. Schoepfle testified that Ser., Dia., and Dam. were living together in the non-relative foster home of Patricia M. They had been placed there for over nine years. Patricia M. was Ser.'s second placement, and Dia. and Dam.'s first and only placement. Ms. Schoepfle visited Patricia M.'s home every month and observed the children interacting with Patricia M. Ms. Schoepfle described their relationship as "affectionate." Patricia M. was very engaged with and attentive to all the children, who would go to her and seek her attention. The children trusted her. The home had no reports of unusual incidents, corporal punishment, or abuse or neglect, and the children's medical and dental care were up to date. Patricia M. had one other foster child in her home. Ser., Dia., and Dam. had positive interactions with Patricia M.'s adult biological children, who were in the home at times. Ser., Dia., and Dam. were not in any services, although Ms. Schoepfle planned on referring them for therapy. Patricia M. wanted to adopt the children.

¶ 57    Des. and Das. were placed together with Dawn S., who was not a relative. Des. and Das. did not need services. Dawn S. wanted to adopt Des. and Das. Dawn S.'s husband and two other foster children also lived in the home. Dawn S.'s daughter and son-in-law lived in another part of the house. Ms. Schoepfle described Dawn S.'s and her husband's interactions with Des. and Das. as very positive. The children referred to Dawn S. as "mom."

¶ 58    Ms. Schoepfle believed that Destiny S.'s parental rights should be terminated because the children were in a stable placement and Destiny S. could not provide stability or supervision. Ms. Schoepfle also believed that the three older children would still want to see Destiny S., and that Ser. trusted Patricia M. to allow them to have continued contact with Destiny S. Patricia M. also allowed contact with some of the children's paternal relatives. Patricia M. allowed the children to have contact with Destiny S. and was supportive of their relationship with her. Patricia M. and Dawn S. knew each other and facilitated sibling visits, which they planned to continue. Ms. Schoepfle believed that the children's interactions with their biological parents were positive but "not very parental" due to the parents' inability to understand age-appropriate parenting. The two younger children, Des. and Das., did not ask about Destiny S. and were quiet when Ms. Schoepfle raised the issue. Des. and Das. also behaved differently than the older children during visits with Destiny S. and seemed more withdrawn during those visits.

¶ 59    Ms. Schoepfle testified that all the children had their own beds, but there was a note in the case file from 2014 stating that Patricia M. had not assembled the children's beds "in a timely manner." Also in 2014, a note indicated that a caseworker found "a man hiding in [Patricia M.]'s closet," but it did not result in any concerns after an investigation.

¶ 60    Foster parent Patricia M. testified that she loved and wanted to adopt Ser., Dia., and Dam. She allowed them to reach out to their parents and would continue to do so after she adopted them because she knew the children loved their parents. However, Patricia M. would confine contact with Damien R. to the telephone due to some "friction" in their history. Patricia M. testified that, during the life of the case, the parents and the agency had expressed concerns about her care of the children, and she believed that some of those concerns were reasonable, but some were unreasonable. She responded to the reasonable complaints. She testified that the man whom the agency discovered in her closet in 2014 was a coworker and had not stayed overnight in her home. Patricia M. testified that when the children become too rambunctious, she would use time-outs and send them to their rooms.

¶ 61    Dawn S., the foster parent for Das. and Des., testified that she and her husband loved the children and wanted to adopt them. She would allow them to continue seeing their siblings in Patricia M.'s home after she adopted them. Also, she would allow visitation with the parents as long as it was safe.

¶ 62    On July 31, 2023, the trial court found that it was in the children's best interests to terminate the parental rights of Destiny S. based on the testimony it heard at both the fitness and best interest hearings.

¶ 63    This appeal followed.

¶ 64                               II. ANALYSIS

¶ 65    On appeal, Destiny S. challenges only the best interests portion of the trial court's termination order; she does not challenge the parental unfitness finding. Thus, she has forfeited

review of the court's unfitness finding. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26 (a parent's decision not to challenge the unfitness finding on appeal forfeits the issue, and unfitness should not be reviewed); see also Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (points not argued on appeal are waived). She argues the trial court's best interests determination is contrary to the manifest weight of the evidence and should be reversed because she is bonded to the children and retaining her parental rights would ensure a future relationship with them.

¶ 66    The State responds that these children deserve the stability and permanency of adoption.

¶ 67    Once a parent has been found unfit pursuant to one or more grounds set out in the Adoption Act (750 ILCS 50/1(D) (West 2022)), the State must establish by a preponderance of the evidence that it is in the child's best interests to terminate parental rights. *In re M.R.*, 2020 IL App (1st) 191716, ¶¶ 26-27. Following an unfitness finding, the trial court holds a best interests hearing and focuses on the needs of the child in determining whether parental rights should be terminated. *Id*. ¶ 27. In determining the best interests of a child, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The trial court's best interests determination will not be overturned unless it is against the manifest weight of the evidence. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 61. The court's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id*.

¶ 68    In determining the best interest of a child under the Juvenile Court Act of 1987 (Act), the court must consider the following factors in the context of the child's age and developmental needs:

(1) the physical safety and welfare of the child, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued), (ii) the child's sense of security, (iii) the child's sense of familiarity, (iv) continuity of affection for the child, and (v) the least disruptive placement alternative for the child; (5) the child's wishes and long term goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

"Additionally, the court may consider the nature and length of the child's relationship with their present caretaker and the effect a change in placement would have upon the child's emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The court's best interest ruling need not contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision. *Id*.

¶ 69    Destiny S. cites *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶¶ 21, 24, 27, for the proposition that, in certain cases, a child's best interests may not favor termination of parental rights, even if the parent is unfit, and the court can decline to terminate parental rights and instead

order a permanency goal of private guardianship. We find, however, that the trial court's determination that the children's best interests favor termination of parental rights in this case is not against the manifest weight of the evidence.

¶ 70    At the time of the termination hearing, Ser., Dia., and Dam. had lived together in Patricia M.'s home for over nine years and their relationship with her was affectionate and engaged. Patricia M. was very attentive and the children trusted her. Ser., Dia., and Dam. also had positive interactions with Patricia M.'s adult biological children and another foster sibling. Patricia M. loved the children and wanted to adopt them. Importantly, Patricia M. allowed Ser., Dia. and Dam. to reach out to Destiny S. and would continue to do so after she adopted the children because Patricia M. knew they loved Destiny S. The caseworker testified that these three children still wanted to see Destiny S. and trusted Patricia M. to continue to allow that contact.

¶ 71    The two younger children, Des. and Das., were placed together with Dawn S., who, along with her husband, loved the children and wanted to adopt them. At the time of the termination hearing, Des. and Das. had lived together in Dawn's home for over six years. That home was stable, and Des. and Das. were strongly bonded to their foster parents. Des. and Das. did not ask about Destiny S. as much as the older children and seemed less interested in seeing her. Even so, Dawn S. testified that she would allow visits and contact between Destiny S. and Des. and Das. if it was safe. Dawn S. also would allow the sibling contact. The two foster parents knew each other and facilitated sibling visits, which they planned to continue.

¶ 72    There is no dispute that Destiny S. loves her children and the three older children, Ser., Dia., and Dam., have a bond with her. However, in several cases, this court has rejected the

argument that guardianship would be preferable to the termination of parental rights based on the children's bond with their parent. In *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶¶ 16, 23, 24, even though the mother and the child enjoyed a very strong bond, this court affirmed the trial court's termination order because the child was thriving with her foster family and permanency was a necessity. In *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 102, this court relied on *Tajannah O.* in affirming a termination of parental rights order where the child had a bond with the parent. This court held that "even if a bond exists *** termination may still be proper if it would result in stability and permanency for the child, a goal that is clearly a primary concern of the Juvenile Court Act." *Id.* ¶ 100 (citing 705 ILCS 405/1-2 (West 2014)).

¶ 73    In *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 37, 38, 44, this court affirmed a trial court's termination order even though the mother had a good relationship with her children because the children were doing well in their foster home and the mother had never progressed beyond supervised visitation, despite receiving services. This court concluded that the stability and support of the children's foster family outweighed any potential trauma the children might face if contact with their mother was discontinued. *Id.* ¶ 40; see *In re Al. P.*, 2017 IL App (4th) 170435, ¶ 62 (best interest finding to terminate the mother's parental rights affirmed even where the oldest child wished to live with his mother).

¶ 74    Destiny S. mentions the possibility of private guardianship for the children, but this court and our supreme court have explained why, in some cases, termination of parental rights and adoption are preferable to private guardianship. In *In re D.T.*, the court held that a child has a protected liberty interest in being raised in a "normal family home" and a "loving, stable and safe

home environment." (Internal quotations omitted.) 212 Ill. 2d at 363. In *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 25, this court, following *D.T.*, held that it must also protect the "statutory and constitutional rights of the child" to a stable, safe, and loving home environment. This court held that "adoption is the only way to achieve finality—a permanent and stable situation for the child after years of uncertainty." *Id.*

¶ 75    Beyond the finality and permanency these children deserve, this court has held that, even when adoption is not a viable goal for a child and there is a parent-child bond, it is just as important to free children from continued involvement with a mother whose "chaotic and disruptive lifestyle" is a detriment to their welfare. *In re M.R.*, 2020 IL App (1st) 191716, ¶ 30. This principle applies here. Destiny S.'s domestic violence history with Damien R. created a chaotic and disruptive home environment. Moreover, because Destiny S. and Damien R. remain together, the chaos and disruption in Destiny S.'s life is likely to continue. She and Damien R. continued having domestic violence incidents, such as the May 2020 incident where she told a police officer that Damien R. put his hands on her neck and pushed her. Between 2019 and 2020, the Chicago police made more than a dozen "calls to service" to the parents' home.

¶ 76    All the children are doing well in their respective pre-adoptive placements and are bonded to their foster parents. In terms of their sense of attachments and of being valued, their integration into and bond with their foster families is an important best interest factor. See 705 ILCS 405/1-3(4.05) (West 2022). It bodes well for Ser., Dia., and Dam.'s well-being that Patricia M. recognizes that they love Destiny S. and would benefit from continued contact with her. The younger children do not seem to have as strong of a bond with Destiny S., but their foster parent is open to allowing

contact with her. See *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 101 (affirming the trial court's termination order and noting that the adopting foster parent would allow the child to see her mother after the adoption); *In re Angela D.*, 2012 IL App (1st) 112887, ¶ 41 (noting that the foster parent was planning on allowing the child to have contact with the mother after adoption).

¶ 77    Furthermore, all the foster parents here were committed to adopting the children and also to ensuring that they had sibling visits. See 705 ILCS 405/1-3(4.05)(7) (West 2022) (the Act's best interests factors include "the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives"). The foster parents' commitment to maintaining the siblings' relationships with each other also favors termination of parental rights and adoption.

¶ 78    Destiny S. relies on *In re B.B.*, 386 Ill. App. 3d 686, 704 (2008), where the court reversed a trial court's termination order. That case, however, is distinguishable because the children in *In re B.B.* had lived with the current foster parents for only 10 months and the evidence did not indicate whether the foster parents were willing to adopt the children. *Id.* at 695. Moreover, the *B.B.* court focused on the fact that the children's foster placement was unstable because the foster mother allowed the mother to have unrestricted access to the children and colluded with the mother to allow her to take the children out of state. *Id.* at 702-03. In addition, the children had maintained a strong bond with their mother because they essentially lived with her, along with the former foster parent, notwithstanding being in DCFS custody. *Id.*

¶ 79    Destiny S. also cites *In re M.F.*, 326 Ill. App. 3d 1110, 1113, 1120 (2002), which reversed a termination order with respect to the mother's older child, who had been living with her father

since her parents' divorce a number of years earlier. The mother regularly visited the child since the divorce, and the child expressed a desire to continue those visits. *Id.* at 1113, 1118. Moreover, because adoption was not an option for the child, the court concluded that termination would not bring her stability but, rather, would deprive her of an established relationship with her mother. *Id.* at 1118. *In re M.F.* is distinguishable because, here, all five children will be adopted by their foster parents.

¶ 80    Illinois law recognizes the children's liberty interests in a safe, loving, stable, and permanent home. *In re D.T.*, 212 Ill. 2d at 363. At the time of the best interests hearing, Ser., Dia., and Dam. had lived with Patricia M. for nine years, and Des. and Das. had lived with Dawn S. for about six years. Although Ser., Dia., and Dam. have a bond with Destiny S., under the facts of this case, that bond does not outweigh their right to and need for permanency and stability. Moreover, the foster parents will allow all five children to maintain their relationship with Destiny S.

¶ 81                           III. CONCLUSION

¶ 82    For the foregoing reasons, we affirm the judgment of the circuit court that found Destiny S. to be an unfit parent and terminated her parental rights to her five children.

¶ 83    Affirmed.