2024 IL App (1st) 231990-U

SECOND DIVISION
August 27, 2024

No. 1-23-1990

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

|  |  |  |
|---|---|---|
| IN THE INTEREST OF: | ) | Appeal from the |
|  | ) | Circuit Court of |
| S.J-E. and E.-E., | ) | Cook County |
|  | ) |  |
|    Minors-Respondents-Appellees | ) |  |
|  | ) |  |
| (PEOPLE OF THE STATE OF ILLINOIS, | ) | Nos. 17JA96 and 18JA1103 |
|  | ) |  |
|    Petitioner-Appellee, | ) |  |
|         v. | ) | Honorable |
|  | ) | Diane M. Pezanoski, |
| HANNAH E., | ) | Judge Presiding. |
|  | ) |  |
|    Mother-Respondent-Appellant.) | ) |  |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. State met burden to prove respondent-mother failed to make reasonable progress toward return of her children over several nine-month periods. Court properly determined that it was in best interests of both children that mother's parental rights be terminated.

¶ 2    Respondent Hannah E. appeals from an order terminating her parental rights over S. J.-E.,

who is approaching his eighth birthday, and his younger sister, E.E. She claims the trial court

erred in its finding of unfitness and likewise erred in finding that it was in the best interests of

each child to terminate her parental rights. For the reasons that follow, we affirm that judgment.

¶ 3                                    BACKGROUND

¶ 4                          I. Adjudicative Proceedings

¶ 5      S.J.-E., a boy, was born prematurely on October 31, 2016. From the beginning, doctors at the hospital were worried about respondent's ability to take care of her son. When the boy cried, she put him in his crib and walked away. At one point, respondent left the hospital and returned smelling of marijuana. S.J.-E was diagnosed with special needs.

¶ 6      Respondent had been diagnosed with numerous mental health disorders, including bipolar disorder, and it was unclear if she was taking her prescribed medications. Additionally, Hannah and the boy's father, S.J., had ongoing domestic battery issues; S.J. had pled guilty to domestic battery only a few months earlier. (The father, S.J., is not a party to this appeal.)

¶ 7      On January 31, 2017, the State filed a motion for temporary custody of S.J.-E. and a petition for an adjudication of wardship, alleging that he was abused and neglected. About six months later, on July 24, 2017, the court found that S.J.-E. was abused or neglected, made him a ward of the court, and concluded that Hannah and S.J. were unable to care for him. The boy was placed in the guardianship of the Department of Children and Family Services (DCFS), which found S.J.-E a foster home.

¶ 8      On October 30, 2018, respondent gave birth to E.E., a girl. S.J. was the biological father. A few weeks later, the State filed a motion for temporary custody and a petition for an adjudication of wardship for her. The petition alleged that E.E. had been abused, that there was a substantial risk of physical injury, and that she was neglected because she lived in an injurious environment. The petition raised concerns that respondent had been diagnosed with bipolar disorder and had tried to commit suicide while she was pregnant with E.E.

¶ 9     On March 8, 2019, the court found that E.E. was neglected because she was in an injurious environment; the court made her a ward of the State. The court noted respondent's history of domestic violence incidents (which she tried to hide from DCFS staff), her bipolar disorder, suicide attempt, and substance abuse issues. E.E., who likewise was diagnosed with special needs, was placed in the guardianship of DCFS, which then placed her with the same foster family as her brother.

¶ 10                    II. Proceedings After Adjudication

¶ 11     In both S.J.-E. and E.E.'s cases, the court set an initial permanency goal of return home within 12 months. As part of that goal, a series of services were put in place to help Hannah.

¶ 12     At the beginning, the hurdles respondent faced were significant. The record bears out that she struggled to find stable housing, and in fact met S.J., her paramour and the father of the children, while hospitalized for psychiatric help. Respondent also could not find regular work, and she was either unable or unwilling to rely on her family. On top of that, the record is replete with her struggles with mental illness; she had been in and out of inpatient medical care through her teenage years and had threatened or attempted suicide numerous times. And there is ample evidence that her relationship with S.J. was rife with conflict and abuse.

¶ 13     The initial service plans reflected these challenges, as well as those of a new, young mother. The plan laid out that respondent needed a mental health evaluation, psychiatric services, medication, individual therapy, parental coaching classes and therapy, domestic violence services, and substance abuse assistance. Additionally, she would get help to find a stable place to live and a job. Over the course of the case, no less than 13 service plans were created to help respondent meet the challenges she faced.

¶ 14     In preparation for the first service plan, respondent detailed her troubled life. She told

caseworkers that she had been using marijuana, heroin, and alcohol throughout her life. She also said she had used methamphetamine, cocaine, and MDMA (ecstasy) at various points. Her relationship with S.J. was violent and fraught; she said that he had kicked her, choked her, hit her with an iron and punched her, but that she always returned to him. Even when she was pregnant with S.J.-E., the father would abuse her and once closed a door on her pregnant body. Although respondent completed domestic violence counseling, after E.E. was born nearly two years after her brother, respondent continued seeing S.J. After her daughter's birth, Hannah admitted she had given S.J. a key to her apartment and that he helped her financially, even though there was ongoing violence between them.

¶ 15     Against this backdrop, Betty Hall, respondent's assigned caseworker, referred Hannah to a variety of services beginning in 2017. Throughout 2017 and 2018, respondent failed to complete the service plan in several key areas, including her substance abuse treatment, finding housing, and following through in individual and parenting therapy. In July 2017, while trying to get drug treatment at an inpatient center, respondent and a worker got into a physical fight, and respondent was discharged from the program. Throughout the first year of her service plan, respondent cycled in and out of treatment centers and programs, often getting into verbal disagreements with staff.

¶ 16     Verbal disagreements became a recurring theme throughout the case. The record is replete with reports that, at various times over the many years this case proceeded, respondent lost her temper or became difficult with the staff who worked with her. For example, in September 2019, after a visit with staff, respondent said she was going to take the children and leave the state, and nobody would know where she was. Additionally, though respondent's individual therapist discharged her from individual counseling and gave her a passing grade, the

therapist still recommended respondent continue therapy because she continued to struggle with mental health, aggression, and anger management issues.

¶ 17    There was progress in some areas, however. In August 2018, Hannah did complete an outpatient drug treatment program. While she missed some drug tests, the ones she did show up for were clean and free of any illegal substances. Also, in March 2018—and after a few hiccups getting started—respondent began therapy sessions, which she would complete successfully three years later.

¶ 18    Yet not everything went smoothly. At about the same time respondent began taking therapy seriously, she became pregnant with E.E. At first, she did not tell caseworkers she was pregnant because she was afraid that they would remove the baby. And though there was continued violence between them, respondent did not tell staff that S.J. was the father and that she had continued her relationship with him. Only after staff told respondent that DNA testing could be used to identify E.E.'s father did she admit she was still seeing S.J.

¶ 19    Despite the turbulent history between them, respondent struggled to complete the necessary domestic violence counseling recommendations in the service plans. While respondent was pregnant with E.E., police were called numerous times to deal with allegations of violence between the two parents. Agency staff did not learn about these incidents until months after they happened. And though respondent did eventually complete domestic violence counseling, it did not seem to stop her and S.J. from seeing—and antagonizing—each other.

¶ 20    But perhaps respondent's biggest struggles, the record reveals, were in parenting classes and coaching. At the start, respondent's efforts were so lackluster that the agency assigned to her case nearly closed it in December 2017. However, after respondent was re-referred to classes, she completed them in March 2018. Coaching was another story. Respondent did not, at any

point, complete her coaching lessons. In October 2019, she was discharged from the program because she was unable or unwilling to implement the techniques she had been taught.

¶ 21    Her struggles were apparent when she visited the children, and though she had many positive interactions with her offspring, caseworkers expressed concerns about her ability to relate to and manage the children's needs. Though respondent began to consistently visit her children in 2019, workers continued to be concerned about the children's safety while in her care. But about the same time, Hall, the caseworker, made a decision not to refer respondent to additional parent coaching services because respondent said she did not want to do them. By now, various parenting coaches had noted that respondent was not making the necessary progress for the children to fully return to her custody and care. During the case, respondent never progressed to the point where she could have unsupervised visits with her children.

¶ 22    In July 2020, Sweety P. Agrawal, a psychologist with the Cook County Juvenile Court Clinic, took stock of the case at the request of the court. The court posed several questions to Agrawal, including what was the likelihood that the children could return home, and what impact terminating respondent's parental rights might have on the children. Agrawal provided a detailed report to the court, which included an interview with the respondent.

¶ 23    After walking through respondent's progress, including her strengths and weaknesses, Agrawal came to a clear conclusion: there was a low chance that respondent could make the necessary progress to allow the children to return home. Agrawal highlighted concerns about respondent's stability with her mental health struggles, interpersonal difficulties, and the consistency of help she could receive from her family. That, coupled with the special needs of her children, led Agrawal to conclude that even with some compliance, there was a low likelihood the children could return to their mother.

¶ 24    Agrawal was more optimistic about the children, however. She concluded that, if the court chose to pursue terminating respondent's parental rights, the effect on the children would be minimal. In fact, the change likely would be positive, Agrawal said, because it would provide both children with stability, predictability, and permanency.

¶ 25    The record shows that on December 2, 2020, responded engaged in a fistfight with the girlfriend of S.J., her children's father.

¶ 26                            III. Change in Goal and Termination Proceedings

¶ 27    On December 7, 2020, the court changed the permanency goal for both children to substitute care pending a court determination on the termination of parental rights. In the order, the court noted that both children had been in their current placement for more than two years, that each had special needs, and that their current caregiver provided excellent care for them. The order also noted that the children had bonded with their caregiver, whom they called "mom."

¶ 28    On September 16, 2021, the State filed motions to permanently terminate both parents' rights. As to respondent, the motions alleged that she had failed to demonstrate a reasonable degree of interest, concern, or responsibility in her children and had failed to make reasonable efforts or progress toward the children's return during several nine-month periods. See 750 ILCS 50/1(D)(b), (m) (West 2022). For S.J-E., there were six periods, running (with some overlap) from July 24, 2017, through September 15, 2021. For E.E., the State alleged that respondent failed to make reasonable efforts or progress over five nine-month periods, beginning on March 9, 2019, and going through September 15, 2021 (again, with some periods overlapping).

¶ 29    It took another two years before the court held an unfitness hearing. On that day, the State amended the petition and proceeded only on the grounds that respondent failed to demonstrate a reasonable degree or interest, concern, or responsibility for her children, and that she failed to

make reasonable progress toward their return over the alleged nine-month periods.

¶ 30    The State began its case by entering into evidence 26 exhibits, approximately 1,800 pages of documents. The exhibits included several integrated assessments, 13 client service plans, four court reports, and several other assessments and reports from counselors and parenting coaches. Hall, the caseworker assigned to the case, testified to the history of the services, proceedings, and respondent's progress (or lack thereof), as we have discussed above. Hall testified that respondent had not complied with the service plans in several areas, including parent coaching, individual therapy, and substance abuse meetings.

¶ 31    In her own defense, respondent testified at the unfitness hearing. She said that she had completed outpatient drug treatment and maintained she was sober. Respondent told the court that, for three and a half years, she had been living on her own and was independent from her abusive former paramour and the children's father. She was employed as a server, had an apartment in Chicago, and was studying to become board certified in message therapy.

¶ 32    Respondent said that she had completed a parenting class as required by the court and that she believed she could be an excellent mother, especially after learning a lot from the classes. She continued to work with a mental health and domestic violence support group program and continued to meet weekly with a therapist to work on her traumatic history. She told the court she had turned her life around in 2020; she realized she needed to leave her abusive ex for good and focus on doing the best she could for her children. Respondent admitted that she had not always been honest with the caseworkers and therapists assigned to her case, but that she had grown as a person and wanted to continue to have a relationship with her children.

¶ 33    In comprehensive oral findings, the court concluded that the State met its burden and proved respondent unfit under both grounds it alleged. The court noted that its "heart breaks for"

respondent, because the source of many of respondent's difficulties were based on her childhood trauma and in part on partnering with an abusive man. Ultimately, however, the court recognized that a parent could be unfit without fault, and here, the court concluded that the children could not safely return home. The court highlighted that it was concerned about the history of domestic violence between respondent and the children's father, and that respondent seemed to struggle to understand how that abusive relationship might affect her children. The court also relied on Agrawal's report, from July of 2020, that respondent was just not making enough progress.

¶ 34    The court acknowledged and appreciated the progress that respondent *had* made, telling her that it was touched by her "soul searching, her journey[.]" But ultimately the court recognized that parents do not have "endless time to get their acts together" and concluded that respondent had not make enough reasonable progress toward the children's return.

¶ 35                              IV. Best Interests Hearing

¶ 36    Immediately after finding respondent unfit, the court proceeded to a hearing on whether it was in the best interests of the children to terminate respondent's parental rights. The mother, foster mother, and Hall all testified at the hearing.

¶ 37    Recognizing again that it was an emotional decision, the court found it in the children's best interests to terminate respondent's parental rights. The court cited the facts that the children had been with the foster mother since shortly after their birth, had bonded with her, had been cared for extremely well, and had integrated into her extended family. The foster mother expressed a desire to adopt the children, and the court believed that terminating respondent's rights would provide both children with permanency and stability. This appeal follows.

¶ 38                                      ANALYSIS

¶ 39    The Juvenile Court Act oversees the termination of a parent's rights to their children. 705

ILCS 405/2-29(2) (2008). Terminating a parent's rights involves two steps. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the State must prove a parent is unfit on one of the grounds laid out in section 1(D) of the Adoption Act. 705 ILCS 405/2-29(2) (West 2022); 750 ILCS 50/1(D) (West 2022). If the State meets its burden and proves a parent is unfit any single ground, that ground alone is sufficient to find a parent unfit. *D.F.*, 201 Ill. 2d at 495. And if the court concludes that a parent is unfit, it then turns its attention to whether it is in the child's best interest to terminate that parent's rights. 705 ILCS 405/2-29(2) (West 2022). If it is in the best interest of the child to sever the legal relationship, the court may terminate the parent's rights. 705 ILCS 405/2-29(2) (West 2022).

¶ 40                                        I. Unfitness

¶ 41     The State must prove a parent is unfit by clear and convincing evidence. *In re D.F.* 201 Ill. 2d 476, 494-95 (2002). We defer to the trial court's findings because it is in the best position to assess the credibility of the witnesses, to assign the appropriate weight to the evidence, and to draw any reasonable inferences. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). We will not reverse unless the trial court's ruling was against the manifest weight of the evidence—that is, unless the opposite result is clearly warranted. *Id.*

¶ 42     The State alleged respondent was unfit on two grounds: ground (b), that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; and ground (m)(ii), that she failed to make reasonable progress toward the return of the child during any 9-month period following the adjudication that the children were abused or neglected. See 750 ILCS 50/1(D)(b), (m)(ii) (West 2022). We begin and end with the latter: that respondent failed to make reasonable progress toward the return of her children.

¶ 43     Reasonable progress is judged by an objective standard, based upon the amount of

progress a parent makes measured from the conditions as they existed when the child was taken from their custody. *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 27. Such progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *Id.* We consider a parent's compliance with any service plans and court directives put in place to help reunite them with their child, in light of the conditions that led to the child's removal, as well as any subsequent conditions that would prevent the child from returning home. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1066 (2006). The ultimate touchstone is whether the child can be returned to parental custody in the near future. *Id.* at 1067.

¶ 44    The starting line is the date the children were adjudicated abused or neglected. 750 ILCS 50/1(D)(m) (West 2022). The court adjudicated S. J.-E. abused or neglected on July 24, 2017, and adjudicated E.E. abused and neglected on March 8, 2019. At the unfitness hearing, the State specified that, for S. J.-E., it was proceeding to have respondent declared unfit on ground (m)(ii) based on six mostly continuous 9-month periods starting on July 24, 2017, and running through September 15, 2021. For E.E., the State alleged five 9-nine month periods, beginning on March 9, 2019, and generally running through September 15, 2021.

¶ 45    Notably, respondent does *not* challenge the findings that she failed to make reasonable progress during (i) the first five of the six 9-month periods regarding S. J.-E. or (ii) the first four of the five 9-month periods regarding E.E. She focuses instead only on the last of the 9-month period, from December 15, 2020 to September 15, 2021. During *that* time period, she argues, she did make reasonable progress, and that should trump the deficiencies in the earlier time periods. The law is well settled, however, that if the State meets its burden of proving a parent did not make reasonable progress during any single alleged 9-month period, a parent may be deemed unfit. See *In re J.L.* 236 Ill. 2d 329, 340 (2010); *In re D.F.*, 208 Ill. 2d 223, 232 (2003); *In re*

*D.D.*, 2022 IL App (4th) 220257, ¶ 39; *In re Phoenix F.*, 2016 IL App (2d) 150431, ¶ 7; *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 25.

¶ 46 And that assumes that we agree with respondent's underlying premise—that she made reasonable progress toward a return home of the children during that final 9-month period of December 15, 2020 to September 15, 2021. The circuit court found otherwise, and the State insists that the court's findings for that time period are supported by the record. The State notes that, while respondent certainly improved her situation by removing herself from S.J.'s home, maintaining sobriety and having positive visits with her children, the record also shows that a number of services remained outstanding and, indeed, that respondent had refused to engage in many of the services despite Hall's continued recommendation that respondent utilize those services.

¶ 47 DCFS's January 2021 evaluation (which included at least part of the relevant 9-month period) noted that respondent "continues to struggle with stability and that she was still displaying behaviors that compromise the safety of her children." She had failed to comply with urine drops, remained in contact with S.J. despite an order of protection, and still had not completed domestic violence services. Likewise, the DCFS evaluation in January 2022 again noted that respondent had not completed certain services despite the case being open for four years.

¶ 48 We acknowledge the difficulty these cases pose for the parties, and we join the circuit court in commending respondent on the improvements she has made to her life after a difficult and traumatic start. But we could not say that the court's finding of a lack of reasonable progress during this final time period was against the manifest weight of evidence. The opposite conclusion is not clearly evident. And we certainly could not find that the court's overall findings

of unfitness, based on the many individual time periods (six for S.J.-E, five for E.E.), were against the manifest weight of the evidence. We thus uphold the finding of unfitness as to each child based on lack of reasonable progress.

¶ 49                                                    II. Best Interests

¶ 50    Respondent also challenges the court's decision that was in the best interest of her children that her rights be terminated. Once the State has established a parent's unfitness, it must then prove by a preponderance of the evidence that terminating the parent's rights is in the best interests of the child. *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26. Unlike the fitness hearing, when determining the best interests of the child, the parent's interest in maintaining the parent-child relationship gives way to the child's interest in a stable, loving home life. *D.T.*, 212 Ill. 2d 347, 364 (2004). Again, because the trial court is in a superior position to evaluate the evidence, we defer to its judgment unless its findings are against the manifest weight of the evidence. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 61.

¶ 51    The Juvenile Court Act lays out several best interest factors the court is to consider. 705 ILCS 405/1-3(4.05) (West 2022). Here, several factors support the trial court's conclusion. Both children have been placed with the same foster mother for nearly their entire life and have developed an attachment to her. *Id*. §1-3(4.05)(d). The evidence shows that the foster mother manages both children's educational, medical, and mental health needs aptly. *Id*. § 1-3(4.05)(a). The children have integrated into their foster mother's family, and both were going to play roles in the foster mother's marriage ceremony.

¶ 52    While the evidence also shows that respondent had a good relationship with her children, she never was able to progress beyond supervised visitation. Meanwhile, the children have been doing well in the foster parent's home. The evidence supports the trial court's judgment that it

was in both children's best interest that respondent's rights be terminated. *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 37-44.

¶ 53                                                            CONCLUSION

¶ 54     The judgment of the circuit court is affirmed.

¶ 55     Affirmed.