2024 IL App (1st) 240531-U

No. 1-24-0531

Order filed December 19, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF I.L. and E.L., | ) ) | Appeal from the Circuit Court of Cook County. |
| Minors-Respondents-Appellees, | ) ) | |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos.   20 JA 1093        20 JA 1094 |
| Bernadette G., | ) ) ) | |
| Mother-Respondent-Appellant.) | ) | Honorable Patrick T. Murphy, Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Lampkin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1      *Held*: We affirm the trial court's order where the court's termination of respondent mother's parental rights was in the best interest of the minors.

¶ 2      Respondent Bernadette G. appeals the trial court's orders terminating her parental rights and granting the State the power to consent to the adoption of Bernadette's minor children, I.L. and E.L. Following adjudicatory and dispositional hearings, the trial court found Bernadette unfit

to parent I.L. and E.L. pursuant to two separate statutory grounds of the Adoption Act: (1) failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare; and (2) failure to make reasonable efforts to correct the conditions that were the basis for the removal and/or failure to make reasonable efforts toward reunification during any nine-month period following the adjudication of neglect or abuse. 750 ILCS 50/1(D)(b), (m) (West 2022). The trial court terminated Bernadette's parental rights and placed I.L. and E.L. in the guardianship of the Department of Children and Family Services (DCFS) with the right to consent to adoption.

¶ 3       Bernadette argues that the court erred in terminating her parental rights, as permanently severing the strong bond between Bernadette and her children was not in the children's best interest. She requests reversal of the trial court's order terminating her parental rights. For the following reasons, we affirm.[1]

¶ 4                                    I. BACKGROUND

¶ 5       Bernadette is the biological mother of daughters I.L., born in October 2015, and E.L., born in July 2020. On July 28, 2020, I.L. and E.L. were taken into protective custody by DCFS. Two days later, the State filed a petition for adjudication of wardship and motion for temporary custody, alleging that I.L. and E.L. were neglected pursuant to the Juvenile Court Act of 1982 (Juvenile Court Act). (705 ILCS 405/2-3(1)(a), (b); (2)(ii) (West 2022)). Specifically, the State noted that Bernadette had an indicated report for inadequate supervision, stemming from a May 30, 2014 incident. Following this incident, Bernadette was hospitalized for depression and opiate abuse after family members found her lethargic. Bernadette was referred to short-term intact family services. However, following I.L.'s birth the next year, Bernadette was indicated for a report of substance misuse by neglect/controlled substance in a newborn. After this incident, Bernadette and the

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

minor's putative father, Clinton L., were referred for community-based services.[2] Due to unsatisfactory progress and the parents' whereabouts becoming unknown, the intact case was closed. Bernadette was again indicated for substance misuse by neglect/controlled substance in a newborn following the birth of E.L. in July 2020. Clinton, who admitted to a history of heroin addiction, had an indicated report for substantial risk of physical injury/environment injurious to health and welfare by neglect. Bernadette admitted to a history of heroin addiction, taking Clinton's methadone prescription, and taking Tylenol with codeine before E.L.'s birth.

¶ 6    Based on the facts alleged in the petition, the circuit court issued an order granting temporary custody of I.L. and E.L. to the DCFS Guardianship Administrator. A finding on Clinton L.'s paternity as to both I.L. and E.L. was entered on September 8, 2020.

¶ 7    The court entered an order on January 20, 2021 following an adjudication hearing, finding I.L. to be neglected due to an injurious environment and being born a drug-exposed infant, and E.L. to be neglected due to an injurious environment. 705 ILCS 405/2-3(1)(b), (c) (West 2020). A dispositional order was entered, adjudicating I.L. and E.L. as wards of the court, finding Bernadette and Clinton unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the girls, and placing the minors in DCFS guardianship. A visitation order and permanency order were entered, with the court setting a goal of return home within 12 months.

¶ 8    On June 14, 2021, the court entered a permanency order setting a goal of return home within five months.

¶ 9    The court entered a dispositional order on November 22, 2021, returning I.L. and E.L. to the care and custody of their parents and incorporating a order of protection. 705 ILCS 405/2-24.

---

[2]I.L. and E.L. share the same biological father. Clinton's parental rights were also terminated and he is not a party to this appeal.

¶ 10    On February 23, 2022, the court granted an emergency motion to vacate the November 22 order of protection, and I.L. and E.L. were again placed in DCFS guardianship. A modified dispositional order was entered, finding Bernadette unable to care for her children. Bernadette made an oral motion to return the children to her care, but the court denied that motion on March 16, 2022.

¶ 11    The court changed I.L.'s and E.L.'s permanency goal on May 16, 2022, to return home within 12 months, finding that the minors' parents had failed to make substantial progress. Specifically, the court noted that Bernadette needed to comply with random urine drops and participate in a psychological evaluation. The court clarified that it would change the goal again at the next court date if the parents continued to fail to make progress.

¶ 12    On December 12, 2022, the court changed the permanency goal to substitute care pending court determination on termination of parental rights (TPR), finding that the parents had failed to progress in services since the minors were removed from their care in February 2022.

¶ 13    The State filed a motion on March 24, 2023 to permanently terminate Bernadette's parental rights and to appoint a guardian with the right to consent to adoption. The petition alleged that Bernadette (1) failed to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare; (2) has been addicted to drugs other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding; (3) failed to make reasonable efforts to correct the conditions which were the basis for the removal of I.L. and E.L.; and (4) is unable to discharge parental responsibilities due to mental impairment or illness. See 750 ILCS 50/1(D)(b), (k), (m), (p) (West 2022). On the same date, the State filed a pleading specifying the nine-month time-period—March 12 through December 12, 2022—that they were

relying on for lack of substantial progress, pursuant to the Adoption Act. 750 ILCS 50/1(D)(m) (West 2020).

¶ 14                                    A. Unfitness Hearing

¶ 15        The trial court conducted an unfitness hearing over several days beginning August 2, 2023, and continuing to September 12 and 18, 2023. The State entered into evidence 23 exhibits: two integrated assessment reports (IAR) (October 29, 2020, and January 4, 2022), six service plans (October 29, 2020; January 12, 2021; July 20, 2021; January 4, 2022; August 28, 2022; and February 28, 2023), psychological reports for the father and mother, certified behavioral and community services documents, parenting certificates for both parents, treatment center records for the mother, counseling records for the father, health services certifications for both parents, birth certificates for both I.L. and E.L., and the certified TASC[3] records from both parents.

¶ 16                                    1. Keajuanis Malena

¶ 17        The State first called Doctor Malena, an expert in clinical psychology and a counseling psychologist for DCFS. Malena and a doctoral intern performed a psychological evaluation for Bernadette on August 17, 2022. Malena authored the report but his intern administered the test. Malena diagnosed Bernadette with unspecified depression due to her depressed mood, isolation of herself from her family, and history of psychiatric hospitalization. Malena's report recommended individual counseling and substance abuse assessment. Malena testified that both opioid substance abuse and depression can lead to lapses in judgment. Malena also authored a psychological evaluation for Clinton. He diagnosed Clinton with unspecified schizophrenia, based on reports of bizarre, delusional behavior and accusations. Upon questioning from the court, Malena conceded that Clinton's reported behavior could also be caused by heroin use but noted that Bernadette had

---

[3]TASC stands for Treatment Alternatives for Safe Communities. Caseworker Tiffany Blanks testified that TASC is "one of the agencies that we use for random urine weekly drops."

expressed that Clinton was diagnosed with schizophrenia. Malena specifically referenced Clinton's unfounded accusations toward the foster parents and the police reports he reviewed that indicated Clinton accused Bernadette of sneaking men out of the second floor of their home after having sexual relations. Malena recommended Clinton for a parenting capacity assessment and individual therapy.

¶ 18    On cross-examination, Malena stated that he performed the psychological evaluations because DCFS requested them. The information he relied upon for his reports came from DCFS documentation and the parents' interviews.

¶ 19                    2. Valencia Randolph

¶ 20    Randolph has worked in child welfare for 25 years and is a program director at Little City Foundation (Little City). Randolph supervised the caseworker's supervisor on I.L.'s and E.L.'s case. Randolph participated in the meeting that recommended the goal change for I.L. and E.L. to substitute care pending determination of TPR. She and the caseworker recommended the goal change because of the parents' minimal progress towards service completion, including their sporadic visitation. Randolph stated that the agency disagreed with the court's decision to return the children to the parents in 2021. On cross-examination, Randolph explained that she received reports from the caseworker and transportation company that the parents' visits were sporadic.

¶ 21                     3. Rania Arar

¶ 22    Arar is a caseworker at Little City who worked on I.L.'s and E.L.'s case in October and November of 2020. Her supervisor was Laura Becerra. Arar prepared the original service plan for the parents and met with them to explain what services they needed for reunification. On cross-examination, Arar testified that Bernadette was cooperative for the month she was the caseworker.

¶ 23                    4. Deneve Carter

¶ 24        Carter was twice called as a witness during the hearing. Carter was the caseworker on I.L.'s and E.L.'s case from November 2020 through May 2022. Carter recommended Bernadette for parent training, substance abuse treatment, methadone treatment, Narcotics Anonymous (NA), Alcoholics Anonymous (AA), individual therapy, and children services (due to concerns regarding I.L.'s development). Carter made referrals for all recommended services and Bernadette engaged in those services. Bernadette and Carter had regular communication through the end of 2021. At some point, Bernadette was granted unsupervised visitation with her children. In November 2021, the children were returned home to the parents, over the agency's objection. Carter did not recommend couples' counseling services because, although the agency had suspicions about intimate partner violence, there was no evidence at the time to indicate it was needed.

¶ 25        In February 2022, DCFS received a hotline call that resulted in the children being removed from the parents' care for the second time. After the children were removed, Carter reconfirmed the required services for Bernadette (individual therapy, substance abuse treatment, NA, random urine drops, and methadone treatment) and made the necessary referrals. However, Bernadette failed to participate in the required services and was not compliant with the random urine tests.

¶ 26        DCFS received a hotline notification call in early March 2022, following a domestic dispute in which Clinton visited the police department and stated that Bernadette was "bugging the home." Police officers visited the parents' home and observed children's toys, holes in the walls, and speakers ripped from the wall. Carter identified a letter that was sent to the parents' home regarding this incident and it was admitted into evidence. At a March 2022 visitation, Clinton expressed his anger with Bernadette due to her losing her job and "hanging out with bad people" who were "doing drugs." During February to May 2022, Carter received at least one report from Bernadette regarding an injury E.L. had sustained (a bump or bruise on her forehead). E.L.'s foster

parent informed Carter that the injury had occurred at daycare and provided an incident report from the daycare center. There was a safety plan in place for E.L. due to the parents' concerns.

¶ 27    Carter detailed evidence that the parents were engaging in substance abuse, including Bernadette's two failed urine drops where the temperature of the sample indicated Bernadette was attempting to use another individual's urine. The next urine drop was also a fail, since Bernadette refused to leave a sample under observation. Due to the failed drops, Bernadette was rated unsatisfactory on her service plan. Clinton was rated satisfactory on his urine drops because he was compliant with requests. However, Carter was present at an April 2022 visitation where she observed peculiar behavior from Clinton that indicated he was under the influence of illicit drugs. At the same visit, Bernadette was less engaged with the children than usual. The parents later failed to attend a child and family team meeting and Bernadette failed to comply with the urine drops.

¶ 28    On cross-examination, Carter explained that the recommended services came from the parents' IAR, and Bernadette and Clinton were supposed to continue to engage in these services upon the children's return home. Prior to the children returning home in 2021, the parents were very compliant with services. Once the children were removed in February 2022, the parents were not compliant. The service plan for each parent was emailed to the individual parent and their attorney. Bernadette received all service plans while Carter was the caseworker. Carter clarified that she was assigned the case in October of 2020, not 2021. Bernadette attended about half of the requested urine drops. The children were bonded and engaged with Bernadette, who showed affection, and Bernadette brought gifts, toys, and food for the children at visits. The parents were always observant and attentive to the children's care. In May 2022, Carter transitioned the case to Tiffany Blanks.

¶ 29                    5. Tiffany Blanks

¶ 30    Blanks testified twice during the unfitness hearing. Blanks worked at several agencies as a caseworker—Camelot in 2019, Kaleidoscope in 2020, and Little City in 2022. Of relevance, she worked on E.L.'s and I.L.'s case from April 2022 to April 2023.[4] Blanks received the case from caseworker Carter, who introduced Blanks to the family. During her tenure on the case, Bernadette and Clinton were seeking reunification as a couple. They were referred to several services— substance abuse treatment, weekly random urine drops, domestic violence counseling, individual therapy, and psychological evaluations. Blanks found it difficult to discuss these services with Bernadette or Clinton because they "never made themselves available." From April 2022 through December 2022, Blanks telephoned the parents, left voicemails, sent text messages, appeared during the parents' weekly visits with their children, and even reached out to the parents' attorneys. Blanks provided both parents with her work phone number and email. When Blanks confronted Bernadette and Clinton about their outstanding services at their visitations, the parents would say "okay," but failed to follow-up with Blanks. Sometime in the summer of 2022, Clinton informed Blanks that Bernadette's phone number had changed and gave Blanks the new number. Clinton's phone number also changed at least twice, but each time he sent Blanks a text message to let her know his new number.

¶ 31    Despite Blanks informing the parents how important it was that they engage in services (specifically weekly random urine drops, substance abuse treatment, individual therapy, and domestic violence counseling), neither Bernadette nor Clinton told Blanks why they were not engaged. Both Bernadette and Clinton missed "approximately all" of their requisite random urine drops between April 2022 and December 2022, and neither were involved in substance abuse

---

[4]At times, Blank's answers vacillated between her starting in April 2022 or May 2022. Blanks later clarified that she was the caseworker from May 2022 to March 24, 2023.

treatment, therapy, or counseling. Blanks once visited the parents' home to verify their residency.[5] In July 2022, the parents informed Blanks that they had moved in with Clinton's mother.

¶ 32    Blanks explained that the required urine drops were "random," in that she would pick a day of the week and send the parents a text message 24 hours in advance of the appointment. She never emailed either parent regarding the urine drop requests nor did she make any unannounced visits to their home to drop off written documentation. Without her case notes, Blanks could not recall if Bernadette completed the scheduled drops more or less than 10% of the time between April and December 2022, but she knew it was less than 25%. Visitation between the children and the parents was typically four hours in length and often occurred at the DCFS office in Harvey, Illinois. Occasionally, these visits occurred in public places, such as a McDonald's restaurant. Blanks testified that she and a coworker, Morgan, attended visits twice to administer urine drops for both parents, but that the parents refused both times.[6] Morgan accompanied Blanks because Morgan was certified to complete urine drops.

¶ 33    Blanks never received a release of information from either Bernadette or Clinton but noted that the agency file already contained a signed release form for each parent. From April to December 2022, Blanks never received any documents from either parent. Blanks's supervisors were Tabatha Coleman (prior to November 2022) and Linda Becerra (after November 2022). She had monthly "supervisory staffings" with her manager to discuss the case and address any safety concerns for I.L. and E.L. At no point was unsupervised contact with the children recommended for either Bernadette or Clinton, because it was not deemed appropriate due to the parents' failure

---

[5]The transcript indicates she testified this occurred in March 2022 (before she was assigned the case), but we believe this is a scrivener's error and should say March 2023.

[6]A last name for Morgan is not provided in the record. Blanks could not recall when these two instances took place but guessed that one was "in March" and the other was "maybe a month prior." However, she stated that both times were "during that time period," seemingly referring to the period from April to December 2022. Later, Blanks states that this was "at the end in March of 2023."

to attend services and complete weekly random urine drops. Likewise, an increase in the number of supervised visits was not considered. At no time did Blanks receive any explanation from either parent regarding why they did not comply with the service requests.

¶ 34    During the summer of 2022, Blanks held a child and family team meeting to discuss ongoing Saturday visitation between I.L. and E.L. and their parents.[7] Both Bernadette and Clinton received telephone calls, text messages, and emails regarding this meeting and although they both attended, it took six attempts for the meeting to occur. During the meeting, Blanks discussed the expectation that the parents would arrive on time for their visitations with I.L. and E.L., and that they would inform the transportation agency and the caseworker if they were running late. In November of 2022, Blanks met with her supervisor Becerra and discussed recommending a permanency goal change to TPR due to the parents' lack of compliance with the urine drops and recommended services. In December 2022, the goal change was made to TPR, but Blanks continued to work with both parents until March of 2023, at which point Morgan became the caseworker.[8] Blanks continued to call the parents, send text messages, and refer the parents for weekly urine drops and individual weekly therapy. In 2022, Bernadette and Clinton completed psychological evaluations. There was no change to the recommended services after Blanks reviewed those evaluations.

¶ 35    The court noted that when the goal was changed to TPR in December 2022, it stated that it would be willing to set the goal back to "return home" if Bernadette and Clinton successfully completed three random drug drops. Blanks responded that the parents had completed "some" random drops but "not all," so the date for compliance was extended and Blanks continued to refer

---

[7]This meeting was required so the agency could have a transportation company transport the children to visitations with their biological parents.

[8]Blanks testified to "March of 2022," but it is clear this is a scrivener's error.

the parents for weekly urine drops. Thereafter, the parents began completing "most" of the urine drops, but did still occasionally miss a week. The court reminded Blanks that she testified "on March 24" that the parents had missed several drops and that Bernadette had tested positive once.

¶ 36 Blanks answered questions regarding test results from Bernadette's prior urine drops, including why she was suspicious of Bernadette's results.[9] While there was no DCFS documentation stating that Bernadette's urine samples needed to be monitored, Blanks stated that putting the referral into the system "pops a suspicion" and alerts TASC that the samples should be observed. Bernadette's urine collection was not monitored or observed when she gave the February 2023 sample that tested positive for cocaine. Blanks confirmed that she has no specialty training for reading laboratory results. Subsequently, the court engaged in a lengthy colloquy with Clinton's counsel and repeatedly stated that the court was considering only missed and positive drops and not any potential dilution of the samples.

¶ 37 On cross-examination by the father's attorney, Blanks could not remember the exact dates of the urine drop requests but conceded that she got results from TASC indicating that Clinton's drops were negative for cocaine, heroin, ecstasy, amphetamines, cannabis, opiates, and creatinine. For Blanks, these negative drops did not re-instill hope that the parents were appropriately complying with services. Blanks did not recall Clinton asking for referrals for services, but she nonetheless let him know what services were needed and referred him to places near his residence. Blanks received one text message from Clinton that he was unable to complete a urine drop because the facility had closed early. After receiving that message, Blanks called the TASC location and was informed that they were open and available for testing.

---

[9]Markers present in both Bernadette and Clinton's tests that indicated dilution and low creatinine levels.

¶ 38    On cross-examination from the mother's attorney, Blanks stated the mother missed three visitations with the children and the father missed two. The visits were safe and appropriate and the parents were nurturing and caring towards I.L. and E.L. Bernadette was concerned about the medical health of her children, and pointed out that E.L. had bumps that appeared to be mosquito bites and was concerned about a potential allergy to dogs. Blanks took these concerns seriously and a safety plan was put in place to set parameters in the foster home so that the dog would not be near E.L.'s play area or her bed. The foster parent told Blanks that the small bumps on E.L. were mosquito bites that E.L. received while outside. Eventually, the dogs were removed from the home due to E.L.'s allergies. Blanks reiterated that the parents did comply with some of the random urine drops and on one of those drops, Bernadette tested positive for drugs. Blanks acknowledged that Bernadette claimed there were issues scheduling the urine drops because of Bernadette's employment, and Blanks received a call from Bernadette's attorney attesting to the same.

¶ 39    On redirect examination, Blanks stated that she never confirmed Bernadette's employment during her tenure on the case, as Bernadette was "very hesitant" to give any information about her employment. Blanks thrice asked Bernadette during the nine-month period to confirm her employment, but Blanks never received an employer name, location, phone number, or schedule in response. Blanks contacted TASC approximately three times during the nine-month period to confirm the operational hours of the requested drop location. Upon questioning from the court, Blanks confirmed she had sent other parents to TASC facilities but no other parents claimed the facilities were closed when they should have been open.

¶ 40                            6. Laura Becerra-Shelton

¶ 41    Becerra-Shelton is currently a supervisor of the child intake and recovery unit at DCFS. From December 2022 through April 2023, Becerra-Shelton worked at Little City and was Blanks's

supervisor. She had meetings with Blanks weekly, and reviewed and approved the service plans that Blanks generated. At no point during this time did Becerra-Shelton recommend a permanency goal change to "return home" for I.L. and E.L., nor did she recommend unsupervised visitation. Bernadette and Clinton were not compliant with any services outside of weekly visitation.

¶ 42                                                7. Kymberle West

¶ 43        West testified twice at the hearing. Foster care supervisor West began working at Little City on May 19, 2023. In June 2023, West briefly supervised Danisha Taylor, who was then the caseworker on I.L.'s and E.L.'s case. After Taylor resigned, West was assigned as the minors' caseworker. As the caseworker, West rated the service plan, monitored the children's safety and their home environment, and coordinated with the transportation company for the family's visitations. The goal for both children was substitute care pending determination of TPR. She made no recommendation for I.L.'s and E.L.'s permanency goal to be changed to "return home," due to the parents' lack of successful engagement with reunification services. Neither did she recommend that the parents be allowed unsupervised visitation or increased supervised visitation with the children. Bernadette and Clinton did not request any community-based referrals from West. At no time did Bernadette or Clinton express any concerns to West regarding the children. West stated there is a safety plan in place for E.L.—who has slight developmental delays—due to concerns about injuries, including a lost tooth. E.L.'s foster parent brought the injury to the attention of the assigned caseworker.

¶ 44        On cross-examination, West agreed that she had not seen Clinton prior to appearing in court in August 2023 and has not reached out to him since. West testified that since August 2, 2023, she has been unable to send the parents to complete urine drops due to (1) the difficulty of finding a facility that is easily accessible for the parents and has staff who physically observe the

specimen collection, (2) the parents moving, and (3) the fact that two individuals responsible for approving drop locations were out of the office. West specified that it was her understanding that Bernadette may have supplied another person's urine for one of the prior tests, so the drops would now require direct observation. West was unaware that the parents had been directly observed at one of the prior facilities. Bernadette disclosed to West that she was "looking at getting connected with individual therapy," but West did not provide any referrals, as Bernadette "made it sound as if she had a provider." On recross-examination, West clarified that she began supervising the prior caseworker in June 2023 but was herself assigned as the caseworker in July 2023.

¶ 45                                    8. Bernadette

¶ 46          Bernadette recently married Clinton, who works as a fire sprinkler inspector. She is not currently employed but was previously a surgical assistant for 16 years. She resigned from her most recent job at a dermatology office "due to not being able to make it for the drops." Prior to the children being returned to her in fall 2021, Bernadette was engaged in extensive services, including individual counseling, substance abuse treatment, outpatient treatment, and parenting classes.

¶ 47          The children were removed from her care in February of 2022, after she and Clinton were involved in a domestic dispute. After I.L. and E.L. were removed, Bernadette spoke with Carter to set up visitation. Carter informed Bernadette that the children were having a very difficult time. After March 2022, Blanks became the caseworker. Bernadette consistently attempted to speak with Blanks and left numerous messages, but Blanks never returned her telephone calls. Despite Bernadette's requests to engage in services, Blanks never gave her the name of any facilities. Blanks attended the family's visitations "once or twice," however, Blanks wanted to stay for the entire visitation. Bernadette had an issue with this because the children associated Blanks with

being taken away from their parents. She asked Blanks not to observe during visitations, since it greatly upset the children. A few weeks before Blanks went on maternity leave, Blanks attended a visitation and Bernadette expressed concerns regarding a "complete change" in E.L.'s personality.

¶ 48   Anytime Bernadette noticed marks, bruises, or any indication that E.L. needed medical intervention, she always reported it immediately, as would the visitation specialist. Bernadette first became concerned after E.L. began crawling and had a black eye in January 2020. Thereafter, there were weekly incidents of bruises, black eyes, or some other type of injury. She reported these injuries but the agency took no action. After the children were removed in February 2022, Bernadette made weekly complaints and took pictures of injuries she observed on E.L. On one March 2022 instance, Bernadette observed E.L. with a black eye and facial bruising. The next week, Bernadette noted a lump on E.L.'s head and reported it. Bernadette did not make any written reports but twice called the hotline to make a report. I.L. has not had any injury incidents since February 2022.

¶ 49   When employed, Bernadette's work hours were "all different" but generally she worked from 7 a.m. to 5 or 6 p.m. While Bernadette gave a work schedule to Blanks, she refused to disclose her place of employment because she was afraid DCFS would call her work and affect her employment. Bernadette asked Blanks to send her for urine drops at facilities that were open late, but Blanks said she would not work around Bernadette's schedule. Bernadette completed some urine drops, in the hope that she could regain custody of her children. Bernadette testified she has not been tendered a service plan since the children were removed in February 2022. Nobody would tell Bernadette what services she needed to complete. Despite Bernadette's repeated attempts to receive referrals for counseling, Blanks refused to help and insisted that it had to be a DCFS approved, licensed facility. Bernadette insisted that Blank's testimony was untruthful. Bernadette

testified that she loves her children more than anything in the world and she is willing to do anything to get her children back.

¶ 50　　She has attended all visitations, except for one when she was unwell. She and Clinton bring toys, food (including breakfast and lunch), and clothing for their children. They usually watch movies, bring the children's favorite toys, and play board games together. I.L. has a challenging time at visitations, as she thinks her parents "sent her away because she was bad." The children enjoy the visits greatly and tell their parents how much they miss and love them. Bernadette maintains that E.L. is very advanced for her age and has no developmental delays. I.L. has a speech delay but is doing well in services. Clinton has never acted erratically and is overjoyed with the children at their visits. Bernadette testified that E.L. has a "permanent lump on her head" and "has to live with a permanent disfigurement" due to an incident that occurred in May 2023. On May 27, 2023, Bernadette witnessed E.L. with facial bruising and a black eye. E.L. explained that "Sonia" hit her.[10] Bernadette took two pictures of E.L. and those pictures were published.[11] The court questioned Bernadette regarding a report the parents made that I.L. was sexually abused by a foster parent. Bernadette explained that I.L. went to the emergency room because she had a big black bruise on her groin.

¶ 51　　On cross-examination, Bernadette clarified that she was employed in 2022 as a surgical assistant at a dermatologist's office. However, she resigned since Blanks was unwilling to work around her work schedule for the urine drops.[12] She has not sought employment since her resignation, as Clinton received a significant raise and she can stay home. Bernadette was prevented from participating in services, as Blanks would not set her up for services and did not

---

[10]There was no further clarification in the testimony as to who "Sonia" is, but it appears "Sonia" is the foster mother.

[11]The court noted it did not observe any bruises in the photograph that was admitted.

[12]Bernadette could not recall when she resigned but thought it might be the end of spring 2022.

help Bernadette at all. Bernadette did not receive a service plan after February 2022 and had "no idea" what she needed to do to regain custody of I.L. and E.L. She knew she needed to complete a psychological evaluation in 2022 because Carter informed her. Bernadette acknowledged that she was involved with drug treatment services in 2016, 2018, and 2020. Bernadette does not believe she has a chronic substance abuse issue. Bernadette conceded she had a "moment of weakness" in February 2023 and used cocaine.

¶ 52        On redirect examination, Bernadette explained her "moment of weakness" was caused by her concern regarding her children's well-being, DCFS's lack of help, and her worry she would never get her children back. She attempted to enroll in services through her private health insurance but DCFS dissuaded her. Three times she missed a urine drop because the facilities were closed.

¶ 53                                    8. Clinton

¶ 54        Clinton is a fire sprinkler technician and works 40 to 60 hours a week. Some days he may work seven hours, and some days he could work as many as 15. In February 2022, he and Bernadette were having problems in their relationship and had been arguing. On February 20, 2022, things "got out of hand," and the police arrived. When they returned later that night with a DCFS employee, they informed him that he had to leave the apartment or they would take the children from the home. Clinton agreed to spend the night at a hotel and left. He returned to retrieve his clothing and observed the police going through the apartment and "bullying" Bernadette. The police officers refused to let him enter the home and they told him they had "found something" and were taking the children. After, Clinton felt his life and Bernadette's went in a downward spiral. Clinton explained that the children are his life and he worked so hard to get them back, that he "gave up." He had no motivation to get out of bed, lost his job, and ultimately they lost their apartment and moved in with his mother. Clinton relapsed and began using controlled substances.

¶ 55 Clinton conceded that he did not comply with any of the requests to submit random urine drops made during the nine-month period. However, he "got [his] stuff together," and was given another opportunity by the court. While he thereafter tried to go to the urine drops, Blanks refused to work with him. He went to every urine drop he was sent to, although there were a "couple times" they showed up towards the end of opening hours and found the facility closed. He addressed the first visit with Morgan and explained he was unaware she was there to collect a urine drop. As to the second visit with Morgan, Clinton stated that Blanks told him in front of the children that they needed to do the drop right then and "the whole thing got heated." The caseworkers considered it a refusal to drop and left the visitation. Clinton missed three visitations due to surgeries.

¶ 56 On cross-examination, Clinton claimed that Blanks did not always give 24-hour notice regarding the urine drops and sometimes texted minutes before the facility closed. Clinton misses his children terribly and was very hurt when visitation was reduced from weekly to monthly. He addressed the March 7, 2023 report to the police and acknowledged that he made false allegations. However, he talked to a professional and "got a lot of that fixed." He took responsibility for his 2022 actions and explained that he should have been worried about his children instead of fighting with Bernadette. He admitted that he was not looking at their best interest at that point. He agreed with most of what Bernadette said about Blanks and stated that Blanks was not helpful.

¶ 57 Following closing arguments, the court found Bernadette and Clinton unfit under grounds (b) (responsibility) and (m). 750 ILCS 50/1(D)(b), (m) (West 2022).

¶ 58 B. Best Interest Hearing

¶ 59 The hearing then shifted from the parents' unfitness towards I.L.'s and E.L.'s best interest.

¶ 60 1. West

¶ 61 West testified that three-year-old E.L. is placed with a specialized, nonrelative foster

parent. E.L. was born substance exposed and was engaged in several early intervention services. E.L. is currently in occupational and behavioral therapy and has a pending referral for speech therapy. There had been concerns regarding E.L.'s balance and gait, and she has explosive, aggressive temper tantrums. West has observed E.L.'s placement within the last 30 days and found the home to be safe and appropriate. There has been a safety plan in place for E.L. since February 2023, which requires the foster parent to immediately notify the agency if there is an incident where E.L. is hurt and seek follow-up medical attention. The safety plan was put in place in response to the biological parents' concerns regarding the number of bruises observed on E.L. West noted that E.L. had a recent incident where she fell and hit her head on the corner of the couch. The foster mother took E.L. to urgent care and provided DCFS with documentation indicating that the doctor had no concerns for E.L. West observed E.L. interact with the foster mother on at least two occasions and noted that E.L. was very content and settled, the interactions were appropriate, and there was affection present. West has not observed E.L. interact with the foster mother's teenage son, who also lives in the house. E.L. attends daycare and there have been no concerns or issues with the care provided. West and the agency are satisfied that the foster mother is meeting E.L.'s special needs.

¶ 62        I.L. is placed with a different nonrelative, specialized foster family. I.L. was born substance exposed and was diagnosed with autism. I.L. is cognitively delayed, with limited speech, and has temper tantrums. She is in a second-grade special education class, has an individualized education program (IEP) at school, and is engaged in specialized therapy for individuals with autism. West has twice observed interactions between I.L. and her foster parents and noted that I.L. is a "very precious, active, sweet child." I.L. is very affectionate with the foster mother and appears very comfortable. Further, I.L.'s speech and behavior have improved since she was placed with the

foster parents. West has not observed I.L. directly interact with her foster brother.

¶ 63        I.L. and E.L. have sibling visits, both at the parent-child visitation and at separate visits. I.L.'s and E.L.'s foster parents live 30 to 45 minutes apart. The agency is recommending TPR and adoption for both children with their respective current foster parents. The agency does not believe E.L. is being abused by the foster parent. West detailed a June 2023 incident in which E.L. lost a tooth after hitting her mouth on her crib in the middle of a tantrum. The foster parent appropriately handled the incident and sought follow-up medical care.

¶ 64        On cross-examination, West conceded that ideally, I.L. and E.L. would be placed together. As West has not observed interactions between E.L. and her biological parents, she could not speak to their bond. E.L. has sustained three injuries since February 2022—the couch and lost tooth accidents, and one instance of bruising from daycare. West noted there are no allergy triggers in the foster home.

¶ 65                                    2. Kieran C.

¶ 66        Kieran testified twice at the best interest hearing. Kieran is a fifth-grade teacher. He has been seven-year-old I.L.'s foster father since the beginning of 2021, except for the three months I.L. was reunited with her biological parents. Kieran and Fabiola O., I.L.'s foster mother, wish to adopt I.L. They have been able to provide a stable, loving home; I.L. is in a good school system; and they have seen I.L. make significant social and academic gains. I.L. has her own bedroom and gets along well with her 12-year-old foster brother. He is kind and supportive of I.L. and she "looks at him like a big brother." Kieran noted that I.L. is high functioning and her autism mostly presents in her delayed verbal communication. I.L. regularly spends time with the foster family's nieces and nephews and has friends from her class. She has medical needs related to her diagnosis of autism and her history of nosebleeds. The family is involved in many community activities,

including sporting events, school fairs, and after-school programs. Kieran believes it is important for I.L. and E.L. to have sibling visitation. He believes visitation between I.L. and her biological parents is also important for I.L. to better understand her identity and maintain confidence.

¶ 67    On cross-examination, Kieran explained that I.L. has not expressed that she misses her biological parents but he believes she misses them and she is usually excited to see them during visitation. Kieran noted a recent shift where I.L. is less distraught if there are cancelations. I.L. sometimes refers to Fabiola as "mom" and sometimes refers to Bernadette as "mom." Likewise, she sometimes refers to Kieran as "dad."

¶ 68                                3. Fabiola O.

¶ 69    Fabiola also testified twice at the hearing. She is a social worker/mental health therapist and is I.L.'s foster mother. Fabiola wishes to adopt I.L. because she loves her very much and can meet I.L.'s physical, emotional, and financial needs. Fabiola has scheduled extra sibling visitations for I.L. and E.L. since the parental visitations have become less frequent. I.L. benefits from the visits with E.L., and, if I.L. were adopted, Fabiola believes it is very important that I.L.'s and E.L.'s relationship continue. Similarly, if I.L.'s biological parents are healthy, visitation between them and I.L. would be beneficial. On cross-examination, Fabiola stated she believes I.L. to be bonded with her biological parents.

¶ 70                                4. Sonia L.

¶ 71    Likewise, Sonia twice testified at the best interest hearing. She is an analyst for the State of Illinois and has been E.L.'s foster mother since E.L. was born, apart from E.L.'s brief return to her biological parents. Sonia wishes to adopt E.L. because she loves her very much, she has taken care of her since birth, E.L. is doing very well, and she wants the best for E.L. E.L. began occupational and physical therapy when she was four or five months old, and she continues to

participate in those therapies. Sonia has seen significant improvement from these therapies. E.L. has her own bedroom and sleeps in a crib since she is a very active child. E.L. has hurt herself in the past, including the lost tooth on the crib and some bruising from daycare. Sonia abides by the safety plan in place for E.L. E.L. takes medicine for allergies and is up to date on all immunizations and doctor's visits. Sonia's son and E.L. get along and E.L. "refers to him as My. My [name]." E.L. visits with Sonia's extended family and calls Sonia "mom" or "mommy." Sonia contacts I.L.'s foster parents to schedule visitations for the girls and would continue to do so if adoption was allowed.

¶ 72        On cross-examination, Sonia stated that she has taken E.L. on vacation to Boston, Texas, and Mexico. Sonia explained E.L.'s "explosive behavior" results from E.L.'s difficulty in regulating her emotions. E.L. is only in her crib while she is sleeping and Sonia responds immediately if E.L. calls her. When E.L. experiences dysregulated behavior, Sonia remains calm so that she can calm E.L. Sonia's son is 13 years old, has no temperament issues, and has never been left alone with E.L. Sonia has never doubted the daycare's explanation E.L.'s injuries.

¶ 73                                   5. Clinton

¶ 74        Clinton believes that it is in I.L.'s and E.L.'s best interest to reside with him and Bernadette. He and Bernadette moved September 1, 2023, to a home that is a block away from I.L.'s and E.L.'s schools. There is space for each girl to have their own room. Regarding the depression Clinton experienced during the relevant nine-month period, he attested it will never happen again because the children are his only priority. If the children were returned home, he would maintain whatever services the girls need. Clinton stated that the girls were in services during the earlier return home period, until "the best school system in the state" informed him that I.L. is not autistic. He stated that I.L.'s "services were false, and she did not need them," and E.L. did not need any services

because she has no behavior problems or developmental delays.

¶ 75    Thereafter, the court continued the best interest hearing to January 16, 2024. The court directed DCFS to identify a TASC facility that provides observation of urine specimen collection, and to communicate at least six random urine drug drop requests prior to January 16, 2024. It further ordered both parents to comply with the urine drops and to enroll in both NA meetings and substance abuse classes within 30 days.

¶ 76    On January 16, the case was continued to February 14, 2024, due to poor weather conditions. On February 14, the State offered into evidence a group exhibit addressing the results of the urine drops ordered by the court at the September 18, 2023 hearing. The court admitted the exhibit and allowed the State to call the current caseworker to address the urine drops.

¶ 77                        6. Kimberly Long

¶ 78    Little City caseworker Long was assigned to I.L.'s and E.L.'s case in October 2023. Long requested six random urine drops for the parents between October 2023 and February 2024 at facilities 20 to 45 minutes away from the parents' residence. She informed the parents by telephone call, text message, and email each time she scheduled a drop. The parents did not request transportation assistance. Neither Bernadette nor Clinton appeared for any of the six required drops. Since the last hearing date, there was no placement change for either E.L. or I.L., and both of their respective placements were still safe and appropriate. As to the children's placements and interactions with their foster and biological parents, Long testified consistently with West's September 18, 2023 testimony. However, Long noted there had been no recent incidents involving E.L. The agency is recommending TPR for Bernadette and Clinton and adoption for I.L. and E.L.

¶ 79    On cross-examination, Long confirmed that the parents have been consistent with visitation since she became the caseworker. She acknowledged that one of the drop notifications was sent at

10 p.m. the night before the scheduled drop. Long was unable to independently verify the parents' enrollment in substance abuse classes because the parents did not sign a "release of information form." Clinton's attorney questioned the voracity of Long's statements regarding when she sent email notifications for the various drop requests and, in response, the court reviewed several records and emails provided by the parties on the issue. The court noted that one of the notifications was sent late, but the other two that were proffered were sent timely.

¶ 80       On redirect examination, Long explained that the time difference between the request time for the urine drops and the time she emailed the parents was the time the supervisor approved the drop and the time she informed the parents about the drop. Regarding the drop with the late email notification, Long called about six hours before the email was sent and texted an hour before. The text message, sent at 10:17 p.m. on the day in question, was published. Neither parent called Long between October 2023 and February 2024 to discuss the urine drops.

¶ 81                                          7. Bernadette

¶ 82       Bernadette testified that she had been notified by e-mail regarding four urine drops, but she did not receive 24-hour notice. She received one text from Long in four months. Bernadette completed a substance abuse program but was never asked to sign a release.

¶ 83                                          8. Clinton

¶ 84       Clinton believed he had to complete the urine drops in the morning and he could not risk losing his job. Long and Blanks never gave the parents "a fair shot." Nonetheless, he is drug free.

¶ 85                                          9. Finding

¶ 86       The State and guardian *ad litem* (GAL) then rested their case-in-chief. The attorneys for Bernadette and Clinton called no further witnesses and rested their cases. Following closing arguments, the court held that it is in the best interest of I.L. and E.L. to terminate Bernadette's

and Clinton's parental rights. The court noted that it gave the parents every opportunity—including numerous random urine drops, continuing the unfitness and best interest hearings, and even sending the children home in 2021. The court recognized the children's need for permanence and stability and found that the least disruptive placement alternative is to keep the children in the foster homes they have been a part of for most of their lives. The court acknowledged Bernadette's and Clinton's love for their children but noted the parents had chosen drugs over their children. The court appointed a guardian with the right to consent to adoption and entered a new permanency order with a goal of adoption. Bernadette filed a timely notice of appeal.

¶ 87　　　　　We note that this appeal was accelerated pursuant to Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to that rule, the appellate court must, except for good cause shown, issue its decision in an accelerated case within 150 days of the filing of the notice of appeal. Here, August 12, 2024. See Ill. S. Ct. R. 311(a)(4), (5) (eff. July 1, 2018). On June 4, 2024, following one extension request, Bernadette's counsel filed an opening brief. Following three extension requests, the appellees' briefs were filed on September 11 and 12, 2024, and the case became ready on October 1, 2024. We find these reasons to constitute good cause for this decision to issue after the timeframe mandated in Rule 311(a).

¶ 88　　　　　　　　　　　　　　　　II. ANALYSIS

¶ 89　　　　　On appeal, Bernadette raises a single issue—whether the court erred in finding it was in I.L.'s and E.L.'s best interest to terminate Bernadette's parental rights. The State counters that the best interest factors supported the termination of Bernadette's parental rights where the girls are in loving and stable pre-adoptive homes and are attached to their foster parents. Bernadette did not file a reply brief.

¶ 90　　　　　The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750

ILCS 50/0.01 *et seq.* (West 2020)) govern the proceedings for termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). "Illinois policy 'favors parents' superior right to the custody of their own children.' " *In re M.I.*, 2016 IL 120232, ¶ 19. This is because our courts recognize that parental rights and responsibilities are of deep import and should not be terminated lightly. *In re C.P.*, 191 Ill. App. 3d 237, 244 (1989). The involuntary termination of parental rights is a two-step process. 705 ILCS 405/2-29(2) (West 2020); *In re M.I.*, 2016 IL 120232, ¶ 20. First, the trial court must determine whether a parent is unfit and, second, the court must determine whether termination of parental rights is in the child's best interests. *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 63.

¶ 91    Before we turn to the merits of the appeal, we note that Bernadette has affirmatively chosen not to challenge the court's findings of unfitness, pursuant to grounds (b), and (m) of the Adoption Act. 750 ILCS 50/1(D)(b), (m) (West 2022). Instead, she requests "the order terminating parental rights should be reversed," where TPR was not shown to be in the children's best interest. We note according to Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), "[p]oints not argued are forfeited and shall not be raised in the reply brief." Accordingly, we find this argument forfeited. See, *e.g.*, *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26 (noting that failure to challenge the unfitness finding results in forfeiture of that issue on appeal). Thus, we will not review the unfitness finding in this cause but, instead, examine only the best interest portion of the trial court's decision. See Ill. S. Ct. R. 341(h)(7).

¶ 92    After a trial court has deemed a parent to be unfit, the court must then conduct a second hearing to determine if termination of the parental rights is in the child's best interest. 750 ILCS 405/2-29(2) (West 2020); *In re D.F.*, 201 Ill. 2d at 495. At this phase, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home

life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The court is to look at all matters that bear on the minors' welfare, including the factors delineated in the Juvenile Court Act. See 705 ILCS 405/1-3(4.05) (West 2022); *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. The State must prove by a preponderance of the evidence that termination is in the minor's best interest. *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. A reviewing court will not reverse a trial court's decision to terminate parental rights unless it is contrary to the manifest weight of the evidence. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 93        It is well established that we defer to the trier of fact since " 'the trial court is in a superior position to assess the credibility of witnesses and weigh the evidence.' " *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 66. We will not substitute our judgment for that of the fact finder. *In re Marriage of Anderson*, 409 Ill. App. 3d 191, 199 (2011). "A trial court need not articulate any specific rationale for its decision, and a reviewing court need not rely on any basis used by a trial court below in affirming its decision." *In re Jaron Z.*, 348 Ill. App. 3d 239, 263 (2004). "There is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re Tajannah O.*, 2014 IL App. (1st) 133119, ¶ 20.

¶ 94        The trial court found that it was in the best interest of I.L. and E.L. to terminate Bernadette's parental rights so that I.L. and E.L. could be freed for adoption by their respective foster parents. Both I.L. and E.L. were born substance exposed and have since been subjected to the effects of Bernadette's illicit drug use. Despite Bernadette's repeated efforts to seek help and comply with services, she has been unable to progress towards sobriety and engage in the requisite services.

Even after her children were returned to her care for three months, Bernadette was unable to prevent her substance abuse from impacting her children. Since being removed from the care of their biological parents, both I.L. and E.L. have been placed in loving, stable foster homes. They have resided with their foster parents for all E.L.'s life (minus the three month return home period) and a substantial portion of I.L.'s life. The trial court concluded that termination of Bernadette's parental rights would provide I.L. and E.L. permanency and stability in their life. We agree with the trial court's determination.

¶ 95    Bernadette admits there is evidence that the children have bonded with their foster parents but argues that I.L. and E.L. are also strongly bonded with her. She argues that she was nurturing, loving, caring, and was concerned about the children's welfare, pointing out potential safety issues with E.L.'s injuries. Further, she notes that I.L. at times had difficulty separating from her at the end of their visitations. Bernadette highlights that the court acknowledged that she has shown interest, clearly visits, and loves her children. Moreover, she claims that the record permits no confidence that the foster parents will allow continued visitation between her and the children. Ultimately, she argues that there was no evidence presented that termination would not be adverse to the children's interest.

¶ 96    We acknowledge Bernadette's statements at trial that she and I.L. and E.L. love each other and are close; the witnesses testified to as much. We also understand Bernadette's natural desire for a guaranteed relationship with I.L. and E.L. and commend the effort she made in consistently attending visitation. However, in this proceeding, a parent's interest in maintaining their familial relationship must yield to the child's interest in a stable, loving home life. *In re D.T.*, 212 Ill. 2d at 364.

¶ 97    The evidence demonstrated that I.L. and E.L. are affectionate towards and bonded to their respective foster families and have connections to the communities in which they live. I.L. has resided with her foster parents since early 2021, save for the three months she returned home. The caseworkers testified that I.L.'s needs are being met, she is thriving, and she is loved. She is bonded to both her foster parents and her foster brother and is very affectionate with her foster mother. Importantly, I.L.'s foster parents acknowledge and accept her diagnosis of autism and have been active in obtaining services to assist her development. This has resulted in a vast improvement in I.L.'s speech and behavior since she was placed with the family. I.L. regularly spends time with the foster family's nieces and nephews and has friends from her class. I.L. is involved in many community activities, including sporting events, school fairs, and after-school programs. Kieran testified he wants to adopt I.L. so he can continue providing her with a stable and loving home. He has observed I.L. make gains socially and academically, she has stability at school, and he can provide her with a lot of support. Fabiola wishes to adopt I.L. because she loves her very much and can meet I.L.'s physical, emotional, and financial needs.

¶ 98    E.L. has resided with her foster mother since she was released from the hospital at five weeks old. She has a strong bond with her foster mother and calls her "mom" or "mommy." She is attached to her foster brother and calls him "mine." She has gone on several vacations with the foster family and she visits with Sonia's extended family. West observed that E.L. was very content and settled with the foster mother, the interactions were appropriate, and there was affection present. Sonia follows the safety plan for E.L. and the agency has no concerns regarding E.L.'s safety. Sonia wants to adopt E.L. because she loves her very much, she has taken care of her since birth, E.L. is doing very well, and she wants the best for E.L.

¶ 99    Bernadette has been involved with DCFS since 2020 and has been unable to adequately

parent I.L. and E.L. since that time. The record indicates that Bernadette has routinely minimized the impact of her severe substance abuse, as well as her inability or unwillingness to comply with the court ordered urine drops. We agree wholeheartedly with Berandette's claims that her drug use "does not make the bonds and attachments between them and the children any less." Nonetheless, the paramount issue remains what is in the best interest and welfare of both I.L. and E.L. And the record here reflects that Bernadette was woefully inconsistent in her interactions with the caseworkers, subjected her children to the effects of her drug use, refused to engage in required services, routinely failed to attend the random urine drops, and exposed her children to domestic violence incidents. As the court noted, the children have been in their foster homes for most of their lives and their current placements are the least disruptive placement alternatives. Further, the court determined that the children's need for permanence, including stability and continuity of parental relationships, favored termination of parental rights. Here the court selected the approach that best provides for I.L.'s and E.L.'s well-being and minimizes further damage to the children.

¶ 100    Bernadette concedes that the record demonstrates that the court gave her various continuances and opportunities to comply with drug testing requirements and avoid termination, and she acknowledges her failure to comply. Yet she argues that even if custody should not have been returned to her, her rights should not have been terminated. Contrary to Bernadette's arguments, private guardianship does not provide the type of finality and permanence the court indicated I.L. and E.L. need in their lives. See *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 33 (noting that although options other than termination exist, return home or adoption are "statutorily preferred."). Further, the court noted the risks of the children entering and being kept in substitute care. While it is reasonable to conclude that the children may face some trauma from the severance of Bernadette's parental rights—and indeed, the court acknowledged termination of parental rights

may cause suffering—it is just as clear that the children may suffer if Bernadette's parental rights are not terminated, due to Bernadette's substance abuse and her inability to provide stability and permanency for the children.

¶ 101     The record reflects that, in considering whether to terminate Bernadette's parental rights, the trial court appropriately considered all the evidence presented and the statutory best interest factors, as well as Bernadette's long-standing history of drug abuse and inability to engage with DCFS services. The court noted it found the caseworkers exceedingly credible and Bernadette not credible. The court acknowledged that the decision to terminate parental rights is "the most profound and difficult thing [a court] can do," and that the decision does impact the children. Similarly, it noted that Bernadette's love for her children is evident and that I.L. and E.L. were bonded strongly to both their biological and foster parents. However, the court found that the totality of the evidence indicates it is in I.L.'s and E.L.'s best interests to terminate Bernadette's parental rights. This finding is not against the manifest weight of the evidence.

¶ 102                                    III. CONCLUSION

¶ 103     Based on the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 104     Affirmed.